Mario Ernesto Amaya, et al. v. DGS Construction, LLC, et al., No. 14, September Term, 2021; Juan Carlos Terrones Rojas, et al. v. F.R. General Contractors, Inc., et al., No. 17, September Term, 2021

**MARYLAND WAGE AND HOUR LAW, MD. CODE ANN., LAB. & EMPL. ("LE") §§ 3-401 TO 3-431 – MARYLAND WAGE PAYMENT AND COLLECTION LAW, LE §§ 3-501 TO 3-509 – CODE OF MARYLAND REGULATIONS 09.12.41.10 – WAGES – OVERTIME COMPENSATION – HOURS OF WORK – UNJUST ENRICHMENT –** Court of Appeals held that Portal-to-Portal Act ("PPA), 29 U.S.C. §§ 251 to 262, has not been adopted or incorporated into Maryland law in either Maryland Wage and Hour Law ("MWHL"), Md. Code Ann., Lab. & Empl. (1991, 2016 Repl. Vol.) ("LE") §§ 3-401 to 3-431, Maryland Wage Payment and Collection Law ("MWPCL"), LE §§ 3-501 to 3-509, or relevant Code of Maryland Regulations ("COMAR").  Specifically, Court concluded that 29 U.S.C. § 254(a) of PPA—which provides, among other things, that time spent traveling to actual place of performance of principal activity or activities which employee is employed to perform is not compensable—has not been implicitly adopted into Maryland law.  In other words, what constitutes "work" under Maryland law is not limited to what is compensable work under PPA and Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 to 219.  As such, issue of whether workers are entitled to compensation for time spent waiting at parking area and traveling to construction site and back must be resolved under Maryland law.

Under Maryland law, issue is whether workers were either required by their employer to report during work hours to location that is employer's premises, to be on duty, or to report to prescribed workplace, or whether employees were traveling from one worksite to another.  If so, under COMAR 09.12.41.10, workers are entitled to compensation.  Court of Appeals concluded that, in each case, issue of whether workers were engaged in hours of work by being required to report to parking area and whether parking area was the employers' premises or prescribed workplace or whether employees were required to be on duty as provided under COMAR 09.12.41.10 involved genuine disputes of material fact, and respective trial courts erred in granting summary judgment and judgment at conclusion of workers' evidence at trial.

In addition, in one case, Court of Appeals concluded that Court of Special Appeals erred in affirming trial court's grant of judgment as to unjust enrichment claim on ground that workers did not perform compensable work, as determination was based on conclusion that PPA applied.

Circuit Court for Prince George's County
Case No. CAL17-26383

Circuit Court for Prince George's County
Case No. CAL18-10797

Argued: November 8, 2021

IN THE COURT OF APPEALS

OF MARYLAND

No. 14

September Term, 2021
_____

MARIO ERNESTO AMAYA, ET AL.

v.

DGS CONSTRUCTION, LLC, ET AL.
_____

No. 17

September Term, 2021
_____

JUAN CARLOS TERRONES ROJAS, ET AL.

v.

F.R. GENERAL CONTRACTORS, INC., ET AL.
_____

*Getty, C.J.
*McDonald
Watts
Hotten
Booth
Biran
Battaglia, Lynne A. (Senior Judge,
Specially Assigned)

JJ.
_____

Opinion by Watts, J.
_____

Filed: July 13, 2022

*Getty, C.J., and McDonald, J., now Senior Judges, participated in the hearing and conference of this case while active members of this Court. After being recalled pursuant to Md. Const., Art. IV, § 3A, they also participated in the decision and adoption of this opinion.

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

In two related cases, construction workers brought actions for unpaid wages and overtime wages under the Maryland Wage and Hour Law ("MWHL"), Md. Code Ann., Lab. & Empl. (1991, 2016 Repl. Vol.) ("LE") §§ 3-401 to 3-431, and the Maryland Wage Payment and Collection Law ("MWPCL"), LE §§ 3-501 to 3-509, and claims for unjust enrichment for the time that they waited and traveled between a parking area where their employers directed them to park and a construction site where they performed physical labor. The workers accessed the construction site via buses, supplied by the general contractor for the project, that took them from the parking area to the construction site and back. The workers were not compensated for wait and travel time, either coming or going from the parking area, which in total averaged approximately two hours per day.

The cases involve the question of whether a federal law which provides that traveling to work is not a compensable activity has been adopted or incorporated into the MWHL, the MWPCL, and the Code of Maryland Regulations ("COMAR") and the related question of whether what constitutes "work" under Maryland law for which wages are due to an employee is limited to what constitutes "compensable work" under federal law. Under the federal Portal-to-Portal Act ("PPA"), 29 U.S.C. §§ 251 to 262, which is an amendment to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 to 219, certain activities are not compensable, including

> **(1)** walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and
>
> **(2)** activities which are preliminary to or postliminary to said principal activity or activities,

which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

PPA, 29 U.S.C. § 254(a).  If the PPA has been adopted or incorporated into Maryland law, then, in these cases, the workers' wait and travel time between the parking lot and the construction site would not be compensable.

In addition, the workers raise the question of whether under COMAR 09.12.41.10 a "prescribed workplace" or "worksite" includes a place that employees are required by an employer to report.[1]  In other words, if the PPA's prohibition on compensation for an employee's travel time has not been adopted into Maryland law, we must determine under Maryland law whether the workers would be entitled to compensation for wait and travel time, if their employers indeed required them to report to the parking area and use it as the sole means of accessing the construction site.  If, however, the workers were not required to report to the parking area, then regardless of the non-applicability of the PPA, under COMAR 09.12.41.10, the workers would not be entitled to compensation for the wait and

---

[1]COMAR 09.12.41.10 provides, in relevant part:

A. "Hours of work" means the time during a workweek that an individual employed by an employer is required by the employer to be on the employer's premises, on duty, or at a prescribed workplace.

. . .

C. Travel time is included in computing hours of work if the individual:

    (1) Travels during regular work hours;

    (2) Travels from one worksite to another[.]

travel time.

In one of the two cases, which we will refer to as the Amaya case, the trial court granted summary judgment in favor of the employer, ruling that the General Assembly grafted the definition of "employ" from the FLSA into the MWHL and correspondingly the PPA was also grafted into the MWHL. Additionally, the trial court ruled that the workers did not perform "work" at the parking area, and that the parking area was not a "worksite" for purposes of the MWHL claim. In the second case, which we will refer to as the Rojas case, during a jury trial, the trial court granted the employers' motion for judgment made at the close of evidence offered by the workers, ruling that no reasonable jury could find that the workers performed "principal or integral activities" at the parking area, that the workers were traveling during work hours, or that they were traveling from one worksite to another.

In each case, the Court of Special Appeals affirmed the trial court's judgment and held that the MWHL and related COMAR regulations incorporate the FLSA, the PPA, and relevant Code of Federal Regulations ("CFR") into Maryland law and that it is not necessary "for Maryland to specifically express that we have adopted an amendment to a federal statute where the Legislature has enacted a state's equivalent of the federal statute." See Amaya v. DGS Constr., LLC, 249 Md. App. 462, 477, 246 A.3d 616, 625 (2021); See Juan Carlos Terrones Rojas, et al. v. F.R. Gen. Contractors, Inc., et al., No. 1529, Sept. Term, 2019, 2021 WL 797245, at *3 (Md. Ct. Spec. App. Mar. 2, 2021). The Court of Special Appeals stated that "[i]ncorporating statutory provisions by reference, partially or entirely, into legislation has been long recognized as an acceptable practice on both the

state and federal levels unless prohibited by constitutional provisions." Amaya, 249 Md. App. at 477, 246 A.3d at 625 (cleaned up); Rojas, 2021 WL 797245, at *3 (cleaned up). The Court of Special Appeals concluded that "the MWHL and its regulations must be read as interrelated parts of the statutory scheme that includes the FLSA, the Portal-to-Portal Act and accompanying regulations." Amaya, 249 Md. App. at 478-49, 246 A.3d at 625-26 (cleaned up); Rojas, 2021 WL 797245, at *3 (cleaned up). In addition, the Court of Special Appeals held that under Maryland law, "to determine what constitutes a worksite, [the Court] examine[s] not whether the employee was required to report to a location, but instead whether the employee performed part of their job function at the location[,]" and concluded that, under that analysis, the workers did not perform job functions at the parking lot and thus the parking lot was not a worksite. Amaya, 249 Md. App. at 483, 246 A.3d at 629; Rojas, 2021 WL 797245, at *3.

With respect to the Rojas case, the Court of Special Appeals concluded that the employers moved for judgment on all claims, which included the unjust enrichment claim, and that the trial court properly ruled in favor of the employers on the claim. Rojas, 2021 WL 797245, at *6. The Court of Special Appeals determined that the trial court properly dismissed all of the claims, including the unjust enrichment claim, as the trial court found that the workers "did not perform compensable services or work when parking and riding the shuttle." Id.

The workers filed in this Court petitions for a writ of *certiorari*, which we granted.[2] See Amaya v. DGS Constr., LLC, 474 Md. 719, 255 A.3d 1090 (2021); Rojas v. F.R. Gen. Contractors, Inc., 474 Md. 720, 255 A.3d 1091 (2021). Against this backdrop, we hold that the PPA has not been adopted or incorporated into Maryland law in either the MWHL, the MWPCL, or relevant COMAR regulations. Specifically, we conclude that 29 U.S.C. § 254(a) of the PPA—which provides, among other things, that traveling to the actual place of performance of principal activity or activities which an employee is employed to perform is not compensable—has not been implicitly adopted into Maryland law. In other words, what constitutes "work" under Maryland law is not limited to what is compensable work under the PPA and FLSA. As such, in these cases, the issue of whether the workers are entitled to compensation for the time spent waiting at the parking area and traveling to the construction site and back must be resolved under Maryland law. Although the workers framed the question in this Court slightly differently, as we see it, under Maryland law, the critical issue is whether the workers were either required by their employer to report during work hours to a location that is the employer's premises, to be on duty, or to report to a prescribed workplace, or whether the employees were traveling from one worksite to another. If so, under COMAR 09.12.41.10, the workers are entitled to compensation.

That said, we conclude that, in each case, there are genuine disputes of material fact as to whether the workers were required to report to the parking area and whether the

---

[2]Oral argument in each case was held on the same day. Although the cases have not been formally consolidated, we issue one opinion due to the similarity of the issues and applicable law.

- 5 -

parking area was the employers' premises or a prescribed workplace or whether the employees were required to be on duty as provided under COMAR 09.12.41.10, and the respective trial courts erred in granting summary judgment and judgment at the conclusion of the workers' case at trial. Accordingly, the cases are remanded to the Court of Special Appeals with instructions to remand the cases to the circuit court for findings by a trier of fact as to whether the workers were required to report to the parking area, whether the parking area was the employer's premises or a prescribed workplace, or whether the workers were required to be on duty, and hence were engaged in hours of work as set forth by COMAR 09.12.41.10. In addition, in the Rojas case, we conclude that the Court of Special Appeals erred in affirming the trial court's grant of judgment as to the unjust enrichment claim on the ground that the workers did not perform compensable work, as this determination was based on the erroneous conclusion that the PPA applied.

## BACKGROUND

### Amaya

In 2014, DGS Construction, LLC d/b/a Schuster Concrete Construction ("DGS"), Respondent,[3] entered into a subcontract with The Whiting-Turner Contracting Company, the general contractor, to perform structural concrete work on construction of the MGM National Harbor resort and casino ("the MGM Project") in Prince George's County. DGS worked on the MGM Project from November 2014 through approximately November 2016, employing numerous construction workers. In 2015, DGS employed Mario Ernesto

---

[3]Daniel G. Schuster, Respondent, is the CEO and owner of DGS. We refer to DGS and Schuster collectively as "DGS."

Amaya and Jose Norland Gonzalez, Petitioners, non-managerial construction workers, to perform construction work on the MGM Project.[4]

To gain access to the MGM Project construction site, DGS directed workers, including Amaya and Gonzalez, to park at the Rosecroft Raceway ("Rosecroft"), an offsite parking area located approximately 2.3 miles from the MGM Project construction site,[5] and then ride buses provided by Whiting-Turner to and from the construction site. The project manual issued by Whiting-Turner contained a description of the term "the Site," which included a description of incidental areas such as parking areas. The project manual included a copy of the prime general contract agreement, which was incorporated into each subcontract. The prime general contract agreement explained "Work Area," by stating: "Prime General Contractor shall confine operations on the Site to areas outlined in the Contract Documents and shall not encumber any unidentified or unapproved Work areas with materials or equipment." The contract defined "the Site"

> as the premises located at 101 Harborview Ave, Oxon Hill, MD 20745 and . . . including but not limited to:
>
> a. the beltway parcel; and
>
> b. "Incidental Areas" which includes any and all material staging, lay down, storage, office, and parking areas located within a twenty-five (25) mile radius of the beltway parcel and which are under the control of Prime General Contractor and whose use is related to work

---

[4]In the complaint, Amaya alleged that he worked for DGS from 2015 to 2016 performing construction work on the MGM Project, and Gonzalez alleged that he worked for DGS in 2015 performing construction work on the MGM Project. In the answer, DGS admitted that Amaya and Gonzalez worked for it "at certain times in 2015 on the Project[,]" but denied the remaining allegations, *i.e.*, that Amaya worked for it in 2016.

[5]Rosecroft was located at 6336 Rosecroft Drive in Fort Washington, Maryland. The MGM Project site was located on National Avenue in Oxon Hill, Maryland.

performed at the Project.

DGS's subcontract provided that DGS "assumes all obligations, duties and responsibilities by which" Whiting-Turner is bound to MGM "pursuant to the Contract documents" and that DGS shall be bound to Whiting-Turner "to the same extent that" Whiting-Turner is bound to MGM "by all of the terms, provisions and conditions set forth in the Contract Documents[.]"

Rosecroft was approved by MGM, the Project's owner, as a parking area for the MGM Project and was under Whiting-Turner's control during construction. Whiting-Turner provided parking at Rosecroft to subcontractors' employees who drove to work because there was no location to park at the MGM Project site. MGM and Whiting-Turner had adopted a "good neighbor" policy to avoid disruptions, such as increased traffic, in the community surrounding the MGM Project site. As part of that policy, Whiting-Turner leased Rosecroft and enforced off-site parking requirements. Whiting-Turner stated that it would revoke access to the MGM Project site for any construction worker who violated the policy by parking a vehicle elsewhere. In a letter to subcontractors, Whiting-Turner explained that, as stipulated in the contracts, "all subcontractor personnel" were required to park at Rosecroft and use the buses, and that "[a]ny workers caught parking at the Prince George's County Park and Ride lot on Oxon Hill Road will be removed from the approved workers list that may enter the jobsite." At one point, DGS's project manager complained to Whiting-Turner that there were insufficient buses to take DGS workers to Rosecroft and that in some instances workers were required to wait two hours or more to get a ride back to Rosecroft. In addition, when the parking area at Rosecroft was unavailable, work at the

construction site stopped.

Amaya and Gonzalez were not required to pay for parking at Rosecroft or for use of the bus to and from Rosecroft to the construction site. When they reached the MGM Project site, Amaya and Gonzalez went through security and then clocked in. At the end of their shifts, they passed back through security, clocked out, and were required to ride a bus back to their vehicles parked at Rosecroft.

Amaya and Gonzalez were not compensated for the time they spent parking, waiting for the bus, traveling on the bus to and from the MGM Project site, or passing through security upon entry to or departure from the MGM Project Site. During an average shift, the time spent waiting, in transit, and passing through security resulted in approximately two hours of uncompensated time. This time was not recorded in any way by DGS.

On September 15, 2017, Amaya and Gonzalez filed in the Circuit Court for Prince George's County a class action complaint against DGS on behalf of themselves and a class of similarly-situated DGS employees for unpaid wages and overtime wages for wait and travel time under the MWHL and the MWPCL.[6] The complaint included three counts: violation of the MWPCL, violation of the MWHL, and unjust enrichment. Amaya and Gonzalez later filed an amended complaint adding Daniel G. Schuster, Respondent, as a defendant.[7]

On February 15, 2019, Amaya and Gonzalez filed a motion for class certification.

---

[6]Jose Amadeo Castillo also originally was a plaintiff in the case but later a line was filed with the circuit court removing Castillo as a named plaintiff.

[7]On April 18, 2018, DGS filed a motion to dismiss the amended complaint, which the circuit court denied. DGS then filed an answer.

After a hearing, the circuit court bifurcated the case and reserved issuing a ruling on the class certification request until after a determination on the issue of liability. On July 1, 2019, DGS filed a motion for summary judgment. On the same day, Amaya and Gonzalez filed a motion for partial summary judgment and request for a hearing. Each party filed an opposition to the other's motion. On August 22, 2019, the circuit court held a hearing and, at the conclusion of the hearing, took the pending motions under advisement for issuance of a written decision.

On November 5, 2019, the circuit court issued a memorandum opinion and order, granting DGS's motion for summary judgment, denying Amaya's and Gonzalez's motion for partial summary judgment, and entering judgment as a matter of law in favor of DGS. The circuit court concluded that, given the similarities in the definitions of the word "employ" in "the original MWHL from 1965 and FLSA[,]" it was "impossible" for the court to determine that "the General Assembly purposely intended to exclude the interpretative history of the [PPA] from MWHL." The circuit court reasoned that, "[b]ecause the General Assembly chose to graft the definition of employ directly from FLSA into the MWHL, [it] also [found] that the interpretative guidance and statutory limitations imposed by the existing [PPA were] also grafted into the MWHL." (Footnote omitted). In considering what constituted a worksite under the MWHL, the circuit court concluded that Amaya and Gonzalez did not perform "work" at Rosecroft because they were not on DGS's premises, on duty, or at a prescribed workplace, and that, accordingly, Rosecroft was not a worksite for purposes of the MWHL. The circuit court stated that, considering the facts in the light most favorable to Amaya and Gonzalez, it concluded that

they were:

> (1) ordered to park and assemble at Rosecroft; (2) received no assignments, directives, or other orders regarding the day's work; (3) donned/doffed no protective equipment; (4) loaded no tools for transit beyond their first and last day at the MGM worksite; and, (5) were shuttled to the MGM site where [they] actually performed construction work on behalf of [DGS]. While the Court agrees with [Amaya and Gonzalez] that "work" does not necessarily involve the exertion of energy, [they] must be involved in activities which are integral and indispensable to principal activities for which they were employed. Here, [Amaya and Gonzalez] were carpenters who worked for [DGS] performing construction work on the MGM National Harbor project. Carpentry at the MGM National Harbor project was [their] principal activity. The Court does not see how any of the activities at Rosecroft was integral and indispensable to [their] role as carpenters.

(Cleaned up).

The circuit court rejected Amaya's and Gonzalez's argument that Rosecroft was a worksite based on definitions in the project manual, stating: "The Court finds no basis to impute the General Contractor's definition of worksite into the employer/employee relationship[.]" The circuit court ruled that Amaya and Gonzalez had not presented any evidence that they were "engaged in any activities that were integral and indispensable to their principal activities as carpenters at any site other than the MGM worksite" and that the project manual had no bearing on the definition of worksite under the MWHL. As such, the circuit court determined that there had been no violation of the MWHL or the MWPCL. The circuit court likewise determined that Amaya and Gonzalez were unable to satisfy the elements of an unjust enrichment claim.

Amaya and Gonzalez appealed, and in a reported opinion, the Court of Special Appeals affirmed the circuit court's judgment. See Amaya, 249 Md. App. at 465-66, 246 A.3d at 618. The Court of Special Appeals held that "the MWHL and COMAR regulations

- 11 -

incorporate the FLSA, [the PPA] amendments thereto, and the Code of Federal Regulations" and that it is not necessary "for Maryland to specifically express that we have adopted an amendment to a federal statute where the Legislature has enacted a state's equivalent of the federal statute." Id. at 477, 246 A.3d at 625. The Court of Special Appeals stated that "[i]ncorporating statutory provisions by reference, partially or entirely, into legislation has been long recognized as an acceptable practice on both the state and federal levels unless prohibited by constitutional provisions." Id. at 477, 246 A.3d at 625 (cleaned up). The Court explained:

> When the MWHL was enacted, the Portal-to-Portal Act amendments to the FLSA had been in existence for decades and the Legislature was aware of this. Since its enactment, the Legislature has passed several amendments but has left "work" undefined as it is in the FLSA. Both statutes and regulations read and define compensable hours of work similarly. . . . [I]n our view, Maryland law comports with the FLSA. As a result, the MWHL and its regulations must be read as interrelated parts of the statutory scheme that includes the FLSA, the Portal-to-Portal Act and accompanying regulations. Amendments to COMAR that directly incorporated certain FLSA regulations, but did not expressly adopt Portal-to-Portal Act language, do not preclude the conclusion that the Legislature intended to partially incorporate the Portal-to-Portal Act into the MWHL when enacting the statute.

Id. at 478-49, 246 A.3d at 625-26 (cleaned up).

The Court of Special Appeals concluded that the circuit court did not err in granting summary judgment in favor of DGS. See id. at 483, 246 A.3d at 629. The Court determined that Amaya and Gonzalez "were not entitled to travel time from the Rosecroft parking lot to the MGM worksite." Id. at 483, 246 A.3d at 629. As to whether Rosecroft constituted a worksite, the Court of Special Appeals stated that it must examine "whether the employee performed part of their job function at [a] location[,]" not whether the

- 12 -

employee was required to report to the location.  Id. at 483, 246 A.3d at 629.  Using that analysis, the Court determined that no job functions were performed at Rosecroft and held that the control test, *i.e*., the question of whether the employees were required to report to a certain location, was not dispositive in determining what constitutes a worksite.  See id. at 483, 246 A.3d at 629.

On April 13, 2021, Amaya and Gonzalez petitioned for a writ of *certiorari*, raising the following three issues:

> 1.      Do the MWHL, the MWPCL and COMAR adopt and incorporate the FLSA, PPA and CFR sections where the Maryland statutes, regulations and legislative history never adopted or incorporated them?
>
> 2.      Is the definition of "work" under the MWHL, MWPCL and COMAR limited to what is considered "compensable work" under the PPA, despite the Maryland General Assembly and regulators never incorporating the federal laws or otherwise saying so?
>
> 3.      Does a "worksite" or "prescribed workplace" under COMAR 09.12.41.10 include a location that an employer directs its employees to report?

On June 22, 2022, we granted the petition.  See Amaya, 474 Md. 719, 255 A.3d 1090.

## Rojas

As explained above, Whiting-Turner was the general contractor for the MGM Project.  In this case, Commercial Interiors, Inc. ("Commercial"), Respondent, is a drywall contractor and was a subcontractor to Whiting-Turner.  F.R. General Contractors, Inc. ("F.R."), Respondent, a drywall contractor, was a subcontractor to Commercial and employed workers to install drywall and ceilings.  Juan Carlos Terrones Rojas and Jose Carlos Rueda Torres, Petitioners, were employed by F.R. to perform carpentry work at the

MGM Project. Rojas and Torres worked at the MGM Project construction site for approximately two months, from November 2015 to January 2016.

Both Whiting-Turner and MGM directed F.R.'s and Commercial's non-managerial workforce to park at the Rosecroft parking area. To gain access to the MGM Project construction site, Rojas and Torres parked at Rosecroft and then took a bus provided by Whiting-Turner. Rojas and Torres would then pass through security and clock-in upon reaching the construction site. At the end of their shifts, Rojas and Torres took a bus back to Rosecroft. Rojas and Torres were not compensated for the time spent waiting, traveling on the buses, and passing through security, which amounted to approximately an hour and a half to two hours each day, and F.R. and Commercial did not track the time.

On April 5, 2018, Rojas and Torres filed in the Circuit Court for Prince George's County a class action complaint on behalf of themselves and a class of similarly-situated F.R. and Commercial employees for unpaid wages and overtime wages for wait and travel time under the MWHL and the MWPCL. The complaint included three counts: violation of the MWPCL, violation of the MWHL, and unjust enrichment. F.R. and Commercial filed an answer.[8]

---

[8]On January 22, 2019, Rojas and Torres filed a memorandum in support of a motion for class certification and requested a hearing. F.R. and Commercial filed a memorandum in opposition to class certification. On April 4, 2019, the circuit court held a hearing, and on April 9, 2019, the circuit court issued an order denying the motion for class certification. The circuit court ruled that Rojas and Torres had not met the burden of proving "the numerosity and commonality factors under Rule 2-231(a)." Rojas and Torres filed a motion to reconsider the denial of class certification and a request for a hearing, and F.R. and Commercial filed an opposition. On June 5, 2019, the circuit court denied the motion to reconsider. Rojas and Torres also filed a renewed motion for class certification or, in

On July 12, 2019, F.R. and Commercial filed a motion for summary judgment. On July 24, 2019, Rojas and Torres filed a motion for partial summary judgment. Both parties filed oppositions. On August 21, 2019, the circuit court held a hearing. During the hearing, the circuit court ruled that there were issues of material fact "in dispute with regard to the Rosecroft area," stating:

> I don't think that these issues have been resolved on the pleadings or they are not completely clear in the law. And there are some discrepancies with regard to the documentation that has been submitted and the deposition testimony and affidavits as to whether or not the employees were required to report as a part of being able to be employed at MGM to Rosecroft to be transported there.

As such, the circuit court denied both Rojas's and Torres's motion for partial summary judgment and F.R.'s and Commercial's motion for summary judgment.

From August 26 to 29, 2019, a jury trial was held.[9] At trial, Rojas and Torres both testified that, on each day they worked at the MGM Project, they traveled from their homes, parked at Rosecroft, boarded a bus, and rode the bus to the construction site. Once at the construction site, they displayed their badge to a scanner or guard and passed through security. They would then walk to the area of the construction site where they were working that day, meet with the crew at "gang boxes," which is where the tools were stored overnight, sign-in, get their tools from the gang boxes, and get directions for the day. At the end of the day, the process was reversed—they returned to the gang boxes, returned

---

the alternative, a second motion to reconsider the denial of class certification, motion for sanctions and to shorten time, and a request for a hearing.

[9]Prior to trial, the circuit court bifurcated the case on the issues of liability and damages, and it was tried on the issue of liability only.

their tools to the gang box, passed back through security, boarded the bus, and returned to Rosecroft. Rojas and Torres testified that they parked at Rosecroft and used the bus because they were told to do so at an orientation given by Whiting-Turner.

Barry Schunck, a safety manager for Whiting-Turner, testified as a witness on behalf of Rojas and Torres. Schunck testified that he conducted orientations for workers for the MGM Project and that the orientations covered parking and transportation to the construction site. Schunck testified that workers were told that they could not park on the construction site and that they were provided information about transportation, specifically, that "[b]uses were scheduled and set up to leave from Rosecroft to drop off employees and pick up employees at the MGM National Harbor and take them back [] throughout the day." He also testified that workers were not allowed to park in specified lots nearby and that being dropped off at the construction site was not permitted for safety reasons. Schunck testified, though, that workers could be dropped off in the nearby lots or park in other lots that were not expressly prohibited. Schunck testified that workers were allowed to use public transportation or Uber.

At the conclusion of Rojas's and Torres's case, F.R. and Commercial moved for judgment, arguing that there had been no legally sufficient evidence presented to support the MWHL and MWPCL claims, as Rojas and Torres did not perform construction work at Rosecroft, commuting time is not compensable, as demonstrated by federal law, and Rosecroft was not a worksite. Counsel for Rojas and Torres responded, arguing that Maryland has not adopted the PPA and that Rojas and Torres were reporting to where they were instructed to be by their employer and therefore were on duty at that time. Counsel

- 16 -

for Rojas and Torres contended that, from the evidence, the jury could easily find that Rosecroft is part of a prescribed workplace. The circuit court granted the motion for judgment, ruling from the bench and making the following findings:

> The evidence in this matter has demonstrated that both [] Rojas and [] Torres [] were hired to work by F.R. [] as construction workers on the MGM project.
> [] Rojas testified that he rode in a carpool with three other individuals, and that they would walk approximately 200 yards from the parking areas, wait in line, and take the bus to the MGM.
> When they arrived to the bus stop area, they would walk to the site, proceed through the security sign-in process, as well as meet [Flores?] to get work assignments for the day, and then begin the workday.
> [] Torres testified that he would drive past the MGM daily in order to park at Rosecroft and take the bus. He testified that he would walk approximately 100 yards from his parking space, wait in line, and take the bus.
> And when he arrived, he would walk to get through the security area and wait in another line and then walk a quarter mile to get to the work area. And he testified that when he arrived at work, the very first thing he would do was sign-in on the sheet, and he would get his -- go to the area where the toolboxes are.
> The sign-in time -- it's undisputed -- was 6:00 a.m. at the worksite or 5:30 a.m. depending, and there was no checking of badges needed at Rosecroft; there was no sign-in or attendance taken at Rosecroft; no directions given at Rosecroft; and the tools were kept at the worksite at MGM.
> There was not any drywall business or carpentry work performed on the bus or at Rosecroft, and . . . there was no instructions of any kind given at Rosecroft with regard to the workday. There was no work done or loading up of any equipment at Rosecroft. And when the plaintiffs went to Rosecroft, they went there only to park was [] Torres'[s] testimony. [] Torres testified also that there was no place to park at the worksite.

With respect to whether Rojas and Torres were required to be compensated for time spent traveling and waiting, the circuit court ruled:

> In Maryland the law is clear. Employees are entitled to be compensated for all hours worked. "'Hours of work' means the time during a workweek that an individual employed by an employer is required by the

- 17 -

employer to be on the employer's premises, on duty, or at a prescribed workplace." And that's COMAR [0]9.12.41.10A.

In this matter, no reasonable jury could find that [Rojas and Torres] did anything other than park at Rosecroft. There was no instruction given, no equipment loaded, no work assigned or received, no principal or integral activities were performed.

Additionally under Maryland law, travel time may be included in computing work hours if the individual travels during regular work hours, travels from one worksite to another, or is called out after work in emergency situations. And that's COMAR, the same cite, 09.12.41.10C.

In this matter, no reasonable jury could find that [Rojas and Torres] were traveling during regular work hours, nor that they were traveling from one worksite to another. And Subsection C of that section does not apply to this case.

Rojas and Torres noted an appeal, and on March 2, 2021, in an unreported opinion, the Court of Special Appeals affirmed the circuit court's judgment. See Rojas, 2021 WL 797245, at *1. Quoting from its opinion in Amaya, the Court of Special Appeals concluded:

Based on our examination of the record, carpentry at the MGM worksite was [Rojas's and Torres's] job function and principal activity. Rosecroft was not a worksite because, while there, [Rojas and Torres] were not engaged in activities that were part of their functions as carpenters. Thus, [Rojas and Torres] were not entitled to travel time from the Rosecroft parking lot to the MGM worksite and the circuit court did not err in granting [F.R.'s and Commercial's] motion for judgment.

Id. at *3.

As to the unjust enrichment claim, the Court of Special Appeals concluded that, based on the record, F.R. and Commercial moved for judgment on all claims for liability, which included the unjust enrichment claim. Id. at *6. The Court determined that, even if the circuit court did not understand the motion for judgment to encompass the unjust enrichment claim, the circuit court's ruling that Rojas and Torres "did not perform

- 18 -

compensable work when parking and riding the shuttle [was] dispositive of the unjust enrichment claim." Id.[10]

On April 20, 2021, Rojas and Torres petitioned for a writ of *certiorari*, raising the following four issues (the first three of which are identical to the issues raised in Amaya):

1.      Do the MWHL, the MWPCL and COMAR adopt and incorporate the Fair Labor Standards Act ("FLSA"), PPA and CFR sections where the Maryland statutes, regulations and legislative history never adopted or incorporated them?

2.      Is the definition of "work" under the MWHL, MWPCL and COMAR limited to what is considered "compensable work" under the PPA, despite the Maryland General Assembly and regulators never incorporating the federal laws or otherwise saying so?

3.      Does a "worksite" or "prescribed workplace" under COMAR 09.12.41.10 include a location that an employer directs its employees to report?

4.      Did the Court of Special Appeals err in importing the federal PPA compensability requirements in determining whether a benefit was conferred on Respondents for the purpose of proving a Maryland common law unjust enrichment claim, especially when Respondents failed to move for judgment on that claim?

On June 22, 2021, we granted the petition. See Rojas, 474 Md. 720, 255 A.3d 1091.

**APPLICABLE STANDARDS OF REVIEW**

"Summary judgment is appropriate where 'there is no genuine dispute as to any

---

[10] In the Court of Special Appeals, Rojas and Torres also argued that the circuit court erred in denying the motions for class certification and in bifurcating damages and liability, and the Court determined that the circuit court did not abuse its discretion in bifurcating damages and liability and that, as there was a finding of no liability, the issue of class certification was moot. See Rojas, 2021 WL 797245, at *6-7. Rojas and Torres did not raise in this Court a question as to the circuit court's ruling on the motions for class certification and bifurcation.

material fact and [] the party in whose favor judgment is entered is entitled to judgment as a matter of law.'" Sanders v. Bd. of Educ. of Harford Cty., 477 Md. 1, 15, 265 A.3d 1083, 1092 (2021) (quoting Md. R. 2-501(f)). "[W]e review a trial court's grant of summary judgment to determine whether the court was legally correct." Id. at 15, 265 A.3d at 1092 (citation omitted). "Only when there is an absence of a genuine dispute of material fact will the appellate court determine whether the trial court was correct as a matter of law." Dashiell v. Meeks, 396 Md. 149, 163, 913 A.3d 10, 18 (2006).

As to a motion for judgment, we review a trial court's grant of a "motion for judgment *de novo*, considering the evidence and reasonable inferences drawn from the evidence in the light most favorable to the non-moving party." Thomas v. Panco Mgmt. of Md., LLC, 423 Md. 387, 393-94, 31 A.3d 583, 587 (2011) (citations omitted). "[W]hen a defendant moves for judgment based . . . upon the legal insufficiency of the plaintiff's evidence, the trial [court] must determine if there is any evidence, no matter how slight, that is legally sufficient to generate a jury question, and if there is, the motion must be denied and the case submitted to the jury." Id. at 394, 31 A.3d at 588 (cleaned up).

Assessing a trial "court's interpretation of a statute is a question of law which[] we review without deference." SVF Riva Annapolis LLC v. Gilroy, 459 Md. 632, 639, 187 A.3d 686, 691 (2018) (citation omitted). "The cardinal rule of statutory construction is to ascertain and effectuate the intent of the General Assembly." Lillian C. Blentlinger, LLC v. Cleanwater Linganore, Inc., 456 Md. 272, 294, 173 A.3d 549, 561 (2017) (citation omitted). We have set forth the relevant rules of statutory construction, stating:

As this Court has explained, to determine that purpose or policy, we

- 20 -

look first to the language of the statute, giving it its natural and ordinary meaning. We do so on the tacit theory that the General Assembly is presumed to have meant what it said and said what it meant. When the statutory language is clear, we need not look beyond the statutory language to determine the General Assembly's intent. If the words of the statute, construed according to their common and everyday meaning, are clear and unambiguous and express a plain meaning, we will give effect to the statute as it is written. In addition, we neither add nor delete words to a clear and unambiguous statute to give it a meaning not reflected by the words that the General Assembly used or engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning. If there is no ambiguity in the language, either inherently or by reference to other relevant laws or circumstances, the inquiry as to legislative intent ends.

Id. at 294, 173 A.3d at 561-62 (citation omitted).

## DISCUSSION

### I. Whether the PPA Has Been Adopted and Incorporated into Maryland Law and Whether the Definition of "Work" Under Maryland Law is Limited to What Constitutes "Compensable Work" Under the PPA[11]

### The Parties' Contentions

Petitioners[12] contend that the PPA has never been adopted into Maryland law.

Petitioners argue that, since being enacted and amended over the years, neither the MWHL

nor the MWPCL makes "a single reference, citation, or mention of the PPA." Petitioners

assert that, although certain federal regulations relating to the FLSA have been expressly

incorporated into COMAR, none of the sections relating to the PPA have ever been

---

[11]Given the interrelated nature of the first two questions in both petitions—whether the MWHL, the MWPCL, and COMAR adopt and incorporate the FLSA, the PPA, and CFR, and whether the definition of "work" is limited to "compensable work" under the PPA—we address the questions together.

[12]Because the arguments made in Amaya's and Gonzalez's brief and Rojas's and Torres's brief are substantially similar, we refer to Amaya, Gonzalez, Rojas, and Torres collectively as "Petitioners."

incorporated and instead that COMAR 09.12.41.10 describing hours of work and when travel can be included in hours of work was promulgated. Petitioners maintain that the PPA's exclusion of compensation is in contravention of the remedial nature of the MWHL and MWPCL.

Petitioners contend that Maryland law makes compensable all hours an employee is on duty, all hours that employees are required by an employer to be at a prescribed workplace, and travel between worksites. Petitioners assert that nothing in the MWHL, MWPCL, or related COMAR regulations indicate that "Hours of Work," as defined by COMAR 09.12.41.10, is limited to principal activities that an employee performs while working for an employer. Petitioners argue that "[g]iven the absence of any reference, express or otherwise, to the PPA's incorporation, there is no justification for 'grafting' the PPA's statutory text into the MWHL or the MWPCL as the" circuit court and Court of Special Appeals did in the cases.

DGS responds that the Court of Special Appeals correctly concluded that the MWHL and its regulations are interrelated parts of a statutory scheme that includes the FLSA, the PPA, and corresponding federal regulations. DGS contends that the purposes of the FLSA, as amended by the PPA, and the MWHL are the same, and that the General Assembly mirrored the MWHL on the FLSA. DGS argues that the relevant COMAR regulation defining "work" under the MWHL mirrors the CFR related to the FLSA. DGS asserts that the "General Assembly relied on and, therefore, incorporated the FLSA and the PPA amendments when it passed the MWHL." DGS maintains that, when the General Assembly enacted the MWHL, it did so in the context of the history of the FLSA and the

- 22 -

PPA and "knowing that incorporating the FLSA into the MWHL by general reference also meant incorporating the PPA regarding compensable time unless they expressly stated otherwise." As such, DGS contends that the MWHL and COMAR must be read to include the PPA's requirement that an employer is not required to pay an employee wages for traveling to and from the actual place of performance of a principal activity which the employee is employed to perform and activities that are preliminary and postliminary to the employee's principal activity.

F.R. and Commercial contend that the FLSA, as amended by the PPA, is Maryland law. F.R. and Commercial argue that the MWHL is Maryland's analog to the FLSA, that Maryland courts look to decisions under the FLSA in interpreting the MWHL and that, under the FLSA, the time claimed by Rojas and Torres is not compensable. F.R. and Commercial assert that Maryland courts have recognized the PPA is a part of Maryland wage law. F.R. and Commercial contend that it is significant that Maryland has not stated that the PPA is not part of the MWHL and the General Assembly enacted the MWHL twenty years after the FLSA was amended by the PPA, at a time when the General Assembly would have been "aware of the state of the FLSA[.]"

**The FLSA, the PPA, and the CFR**

In 1938, the United States Congress enacted the FLSA.[13] As originally enacted, the

_____

[13]29 U.S.C. § 202 sets forth the "Congressional finding and declaration of policy" for the Act as follows:

**(a)** The Congress finds that the existence, in industries engaged in commerce or in the production of goods for commerce, of labor conditions detrimental

FLSA established a minimum wage, see 29 U.S.C. § 206(a)(1); 52 Stat. 1062, and required that employers engaged in commerce or in the production of goods for commerce provide employees overtime compensation for each hour worked beyond a forty-hour workweek, see 29 U.S.C. § 207(a), 52 Stat. 1063. The FLSA, as originally enacted and is still the case today, does not define the term "work." See 29 U.S.C. § 203. Rather, the FLSA defines the term "employ," which "includes to suffer or permit to work." 29 U.S.C. § 203(g).

In the 1940s, in a series of cases, the Supreme Court of the United States sought to define "work" for purposes of the FLSA. In Tenn. Coal, Iron & R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 591-92 & n.2 (1944), the Supreme Court addressed the issue of "what constitutes work or employment in underground iron ore mines within the meaning of the" FLSA, and, in particular, whether time spent by miners traveling underground in mines to and from the locations where they drilled and loaded ore constituted "work or employment for which compensation must be paid under the Act." This issue was

_____

to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several States; (2) burdens commerce and the free flow of goods in commerce; (3) constitutes an unfair method of competition in commerce; (4) leads to labor disputes burdening and obstructing commerce and the free flow of goods in commerce; and (5) interferes with the orderly and fair marketing of goods in commerce. That Congress further finds that the employment of persons in domestic service in households affects commerce.

**(b)** It is declared to be the policy of this chapter, through the exercise by Congress of its power to regulate commerce among the several States and with foreign nations, to correct and as rapidly as practicable to eliminate the conditions above referred to in such industries without substantially curtailing employment or earning power.

important because, if the underground travel time constituted work, the miners worked more than the statutory maximum workweek and were entitled to overtime compensation for the excess time.  See id. at 593.  The Supreme Court held that work or employment had the common meaning of "physical or mental exertion (whether burdensome or not) controlled or required by the employer and pursued necessarily and primarily for the benefit of the employer and his business."  Id. at 598 (footnote omitted).  The Supreme Court concluded that underground travel in mines was work or employment within the meaning of FLSA, explaining:

> The exacting and dangerous conditions in the mine shafts stand as mute, unanswerable proof that the journey from and to the portal involves continuous physical and mental exertion as well as hazards to life and limb. And this compulsory travel occurs entirely on [the employers'] property and is at all times under their strict control and supervision.  Such travel, furthermore, is not primarily undertaken for the convenience of the miners and bears no relation whatever to their needs or to the distance between their homes and the mines.  Rather the travel time is spent for the benefit of [the employers] and their iron ore mining operations.

Id. at 598-99 (paragraph break and footnote omitted).  Accordingly, the Supreme Court concluded that the FLSA required that the miners be paid the appropriate compensation for such work.  See id. at 603.

Later in the same year, in Armour & Co. v. Wantock, 323 U.S. 126, 126-27 (1944), the Supreme Court considered whether an employer was required to pay overtime to firefighters for time spent on an employer's premises as on-call firefighters but the time was "put to such personal use as sleeping or recreation."  The Supreme Court described this time as "time during which these men were required to be on the employer's premises, to some extent amenable to the employer's discipline, subject to call, but not engaged in

any specific work" and the men were not permitted to leave the premises, except with permission, to go out to eat for dinner. Id. at 128. The Supreme Court stated:

> Of course an employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen. Refraining from other activity often is a factor of instant readiness to serve, and idleness plays a part in all employments in a stand-by capacity. Readiness to serve may be hired, quite as much as service itself, and time spent lying in wait for threats to the safety of the employer's property may be treated by the parties as a benefit to the employer. Whether time is spent predominantly for the employer's benefit or for the employee's is a question dependent upon all the circumstances of the case.

Id. at 133. The Supreme Court concluded that the FLSA did not exclude as work time periods spent on call simply because the firefighters had time to themselves. See id. at 134.

Less than two years later, in Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 682-83 (1946), the Supreme Court addressed working time for purposes of the FLSA and whether employees of a pottery plant were entitled to compensation for time spent walking to and from the time clock to their working places. The Supreme Court determined that the employees had demonstrated that they were required "to be on the premises for some time prior and subsequent to the scheduled working hours[,]" stating:

> The employer required them to punch in, walk to their work benches and perform preliminary duties during the 14-minute periods preceding productive work; the same activities in reverse occurred in the 14-minute periods subsequent to the completion of productive work. Since the statutory workweek includes all time during which an employee is necessarily required to be on the employer's premises, on duty or at a prescribed workplace, the time spent in these activities must be accorded appropriate compensation.

Id. at 690-91.

The following year, in 1947, Congress responded by passing the PPA, amending

certain provisions of the FLSA and relieving employers of liability under the FLSA for the

failure to pay employees minimum wages or overtime compensation for certain specified

activities.  See 29 U.S.C. §§ 251, 252, 254.[14]  In particular, 29 U.S.C. § 254(a) amended

the FLSA by providing that the following activities are not compensable:

> Except as provided in subsection (b), no employer shall be subject to any liability or punishment under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act, on account of the failure of such employer to pay an employee minimum wages, or to pay an employee overtime compensation, for or on account of any of the following activities of such employee engaged in on or after May 14, 1947--
>
> > **(1)** walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and
> >
> > **(2)** activities which are preliminary to or postliminary to said principal activity or activities,

---

[14]29 U.S.C. § 251, setting forth the "Congressional finding and declaration of policy" for the PPA, provides, in pertinent part:

> **(a)** The Congress finds that the Fair Labor Standards Act of 1938, as amended, has been interpreted judicially in disregard of long-established customs, practices, and contracts between employers and employees, thereby creating wholly unexpected liabilities, immense in amount and retroactive in operation, upon employers with the results that, if said Act as so interpreted or claims arising under such interpretations were permitted to stand, . . . (3) there would be created both an extended and continuous uncertainty on the part of industry, both employer and employee, as to the financial condition of productive establishments and a gross inequality of competitive conditions between employers and between industries; (4) employees would receive windfall payments, including liquidated damages, of sums for activities performed by them without any expectation of reward beyond that included in their agreed rates of pay; (5) there would occur the promotion of increasing demands for payment to employees for engaging in activities no compensation for which had been contemplated by either the employer or employee at the time they were engaged in; . . . and (10) serious and adverse effects upon the revenues of Federal, State, and local governments would occur.

which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities. For purposes of this subsection, the use of an employer's vehicle for travel by an employee and activities performed by an employee which are incidental to the use of such vehicle for commuting shall not be considered part of the employee's principal activities if the use of such vehicle for travel is within the normal commuting area for the employer's business or establishment and the use of the employer's vehicle is subject to an agreement on the part of the employer and the employee or representative of such employee.[15]

---

[15]The PPA additionally provides:

**(b) Compensability by contract or custom**

Notwithstanding the provisions of subsection (a) which relieve an employer from liability and punishment with respect to any activity, the employer shall not be so relieved if such activity is compensable by either--

**(1)** an express provision of a written or nonwritten contract in effect, at the time of such activity, between such employee, his agent, or collective-bargaining representative and his employer; or

**(2)** a custom or practice in effect, at the time of such activity, at the establishment or other place where such employee is employed, covering such activity, not inconsistent with a written or nonwritten contract, in effect at the time of such activity, between such employee, his agent, or collective-bargaining representative and his employer.

**(c) Restriction on activities compensable under contract or custom**

For the purposes of subsection (b), an activity shall be considered as compensable under such contract provision or such custom or practice only when it is engaged in during the portion of the day with respect to which it is so made compensable.

**(d) Determination of time employed with respect to activities**

In the application of the minimum wage and overtime compensation provisions of the Fair Labor Standards Act of 1938, as amended, of the Walsh-Healey Act, or of the Bacon-Davis Act, in determining the time for

Like the FLSA, the PPA does not define the term "work." See 29 U.S.C. § 262. Federal regulations in the CFR were promulgated in 1947 following the passage of the PPA, providing a "General Statement as to the Effect of the Portal-to-Portal Act of 1947 on the Fair Labor Standards Act of 1938." See 29 C.F.R. §§ 790.1 to 790.22. One regulation explains the interrelationship of the FLSA and PPA, stating, in relevant part:

> The effect on the Fair Labor Standards Act of the various provisions of the Portal Act must necessarily be determined by viewing the two acts as interrelated parts of the entire statutory scheme for the establishment of basic fair labor standards. The Portal Act contemplates that employers will be relieved, in certain circumstances, from liabilities or punishments to which they might otherwise be subject under the Fair Labor Standards Act.

29 C.F.R. § 790.2(a). Another regulation, 29 C.F.R. § 790.7, addresses "preliminary" and "postliminary" activities discussed in 29 U.S.C. § 254 of the PPA, and provides in part:

> (d) An employee who walks, rides or otherwise travels while performing active duties is not engaged in the activities described in section 4(a)[, i.e., 29 U.S.C. § 254(a)]. An illustration of such travel would be the carrying by a logger of a portable power saw or other heavy equipment (as distinguished from ordinary hand tools) on his trip into the woods to the cutting area. In such a situation, the walking, riding, or traveling is not segregable from the simultaneous performance of his assigned work (the carrying of the equipment, etc.) and it does not constitute travel "to and from the actual place of performance" of the principal activities he is employed to perform.
>
> . . .
>
> (f) Examples of walking, riding, or traveling which may be performed outside the workday and would normally be considered "preliminary" or

which an employer employs an employee with respect to walking, riding, traveling, or other preliminary or postliminary activities described in subsection (a) of this section, there shall be counted all that time, but only that time, during which the employee engages in any such activity which is compensable within the meaning of subsections (b) and (c) of this section.

29 U.S.C. § 254(b)-(d).

"postliminary" activities are (1) walking or riding by an employee between the plant gate and the employee's lathe, workbench or other actual place of performance of his principal activity or activities; (2) riding on buses between a town and an outlying mine or factory where the employee is employed; and (3) riding on buses or trains from a logging camp to a particular site at which the logging operations are actually being conducted.

29 C.F.R. § 790.7(d), (f).

Following enactment of the PPA, the Supreme Court set forth a test to determine whether a particular activity is preliminary or postliminary to an employee's principal activities and therefore not compensable work. In <u>Steiner v. Mitchell</u>, 350 U.S. 247, 248 (1956), the Supreme Court considered

> whether workers in a battery plant must be paid as a part of their 'principal' activities for the time incident to changing clothes at the beginning of the shift and showering at the end, where they must make extensive use of dangerously caustic and toxic materials, and are compelled by circumstances, including vital considerations of health [and] hygiene, to change clothes and to shower in facilities which state law requires their employer to provide, or whether these activities are 'preliminary' or 'postliminary' within the meaning of the Portal-to-Portal Act and, therefore, not to be included in measuring the work time for which compensation is required under the Fair Labor Standards Act.

The Supreme Court concluded "that activities performed either before or after the regular work shift, on or off the production line, are compensable under" the PPA provisions of the FLSA "if those activities are an integral and indispensable part of the principal activities for which covered [employees] are employed and are not specifically excluded by Section 4(a)(1)[, *i.e.*, 29 U.S.C. 254(a)(1)]." Id. at 256. Applying that test, the Supreme Court determined that, under the circumstances of the case, "it would be difficult to conjure up an instance where changing clothes and showering are more clearly an integral and indispensable part of the principal activity of the employment than in the case of these

- 30 -

employees." Id.

The integral and indispensable test is still used today. In Integrity Staffing Solutions, Inc. v. Busk, 574 U.S. 27, 33 (2014), the Supreme Court stated that it "has consistently interpreted the term 'principal activity or activities' to embrace all activities which are an 'integral and indispensable part of the principal activities.'" (Cleaned up). As the Supreme Court explained, "[a]n activity is [] integral and indispensable to the principal activities that an employee is employed to perform if it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities." Id. By contrast, "an activity is not integral and indispensable to an employee's principal activities unless it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform those activities." Id. at 35. The key is that "[t]he integral and indispensable test is tied to the productive work that the employee is *employed to perform*." Id. at 36 (emphasis in original) (citations omitted).

As the Supreme Court has noted, the FLSA does not define the term "work" or "workweek" and the PPA does not include any definition of the term "work" either. See IBP, Inc. v. Alvarez, 546 U.S. 21, 25-26 (2005). In IBP, id. at 28, after quoting 29 U.S.C. § 254(a) of the PPA, the Supreme Court stated:

> Other than its express exceptions for travel to and from the location of the employee's "principal activity," and for activities that are preliminary or postliminary to that principal activity, the Portal-to-Portal Act does not purport to change this Court's earlier descriptions of the terms "work" and "workweek," or to define the term "workday." A regulation promulgated by the Secretary of Labor shortly after its enactment concluded that the statute had no effect on the computation of hours that are worked "within" the workday.

The Supreme Court observed, though, that, consistent with its "prior decisions interpreting the FLSA, the Department of Labor has adopted the continuous workday rule, which means that the 'workday' is generally defined as 'the period between the commencement and completion of the same workday of an employee's principal activity or activities.'" Id. at 29 (quoting 29 C.F.R. § 790.6(b)).

### The MWHL, the MWPCL, and COMAR

The United States District Court for the District of Maryland has observed that the "FLSA contains a 'saving clause', 29 U.S.C. § 218(a), that permits states or municipalities to enact laws that provide additional protections for employees beyond the minimum requirements established by the FLSA." Butler v. DirectSat USA, LLC, 800 F. Supp. 2d 662, 671 (D.Md. 2011) (citation omitted). To that end, in 1965, the General Assembly enacted the MWHL, initially codified at Md. Code (1957, 1965 Repl. Vol.), Art. 100, §§ 81-93, for the purpose of "establishing a wage and hour law fixing minimum wages for employees, with certain exceptions . . . and relating generally to the wages paid to and the hours worked by employees in this State." 1965 Md. Laws 966 (Ch. 697, S.B. 468). Md. Code, Art. 100, § 81 set forth the General Assembly's finding "that there are persons employed in some occupations in the State of Maryland at wages insufficient to provide adequate maintenance and to protect health." 1965 Md. Laws 966; see also LE § 3-402(a). Md. Code, Art. 100, § 81 stated that the policy of the Act was "to establish minimum wage compensation standards" in Maryland "to provide a maintenance level consistent with the needs of the population for their health, efficiency and general well-being[,]" with "[a]ny agreement to work for less be[ing] null and void." 1965 Md. Laws 967; see also LE §§ 3-

402(b)(1), 3-405. Such a policy would "tend to safeguard employers and their employees against unfair competition and [would] increase the stability of industry and the purchasing power of employees and decrease the need for supplemental payments of public moneys for the relief of these employees." 1965 Md. Laws 967; see also LE § 3-402(b)(2) to (b)(5). The following year, in 1966, the General Assembly enacted the MWPCL, originally codified at Md. Code (1957, 1966 Repl. Vol.), Art. 100, § 94, for the purpose of "relating generally to wage payment and collection, imposing requirements as to the regularity, frequency and medium of wage payments and permissible deductions therefrom[.]" 1966 Md. Laws 1213 (Ch. 686, H.B. 784).

Currently, the MWHL provides that the subtitle "does not diminish[] a right of an employee that is granted under the federal Act[,]" LE § 3-404(2) (paragraph break omitted), *i.e.*, "the federal Fair Labor Standards Act of 1938[,]" see LE § 3-401(c) (footnote omitted). The MWHL requires that an employer must pay an employee at least the greater of the federal or State minimum wage. See LE § 3-413(b). The MWHL also provides that, with certain exceptions as to specific employers and employees, "each employer shall pay an overtime wage of at least 1.5 times the usual hourly wage, computed in accordance with § 3-420 of this subtitle." LE § 3-415. The MWHL provides:

> If an employer pays an employee less than the wage required under this subtitle, the employee may bring an action against the employer to recover:
>
> > (1) the difference between the wage paid to the employee and the wage required under this subtitle;
>
> > (2) an additional amount equal to the difference between the wage paid to the employee and the wage required under this subtitle as liquidated damages; and

(3) counsel fees and other costs.

LE § 3-427(a).

The MWPCL requires that each employer establish regular pay periods and pay an employee a wage in United States currency or "by a check that, on demand, is convertible at face value into United States currency." LE § 3-502(a), (c). LE § 3-505(a) sets forth the requirement that an employer pay an employee "all wages due for work that the employee performed before the termination of employment[.]" The MWPCL defines "wage" to mean "all compensation that is due to an employee for employment" and includes a bonus, a commission, a fringe benefit, overtime wages, and any other remuneration promised for service. LE § 3-501(c). The MWPCL provides that, notwithstanding the enforcement remedies set forth in LE § 3-507, if an employer fails to pay an employee in accord with LE §§ 3-502 or 3-505, "after 2 weeks have elapsed from the date on which the employer is required to have paid the wages, the employee may bring an action against the employer to recover the unpaid wages." LE § 3-507.2(a). Under the MWPCL, an "employer" "includes any person who employs an individual in the State or a successor of the person." LE § 3-501(b). For purposes of both the MWHL and MWPCL, the word "employ" "means to engage an individual to work" and includes "allowing an individual to work" and "instructing an individual to be present at a work site." LE § 3-101(c).[16]

---

[16]As originally enacted, the MWHL defined the word "employ" as including "to suffer or to permit to work[,]" Md. Code, Art. 100, § 82(c); 1965 Md. Laws 967, which

As we stated in Peters v. Early Healthcare Giver, Inc., 439 Md. 646, 652-53, 97 A.3d 621, 624-25 (2014), the MWHL and the MWPCL are wage enforcement laws, with the MWHL aiming "to protect Maryland workers by providing a minimum wage standard[,]" and the MWPCL requiring "an employer to pay its employees regularly while employed, and in full at the termination of employment." (Citations omitted). "Read together, these statutes allow employees to recover unlawfully withheld wages from their employer, and provide an employee with two avenues to do so." Id. at 653, 97 A.3d at 625 (citation omitted).

As originally enacted, Md. Code, Art. 100, § 85(a) of the MWHL provided the Commissioner of the Department of Labor and Industry, with the approval of a committee appointed by the Governor, the authority to "make such regulations as may be appropriate to carry out the purposes of th[e] Act." 1965 Md. Laws 969. Currently, with respect to regulations, LE § 3-410 provides:

> In addition to any regulation specifically required by this subtitle, regulations that the Commissioner adopts to carry out this subtitle may include:
>
> > (1) definitions of the terms "administrative capacity", "executive capacity", "professional capacity", and "outside salesman";
> >
> > (2) a scale of wages that is suitable for learners and apprentices but is at least 80% of the minimum wage under this subtitle; and
> >
> > (3) a wage for a special case or class of case if the Commissioner finds the wage appropriate to:
> >
> > > (i) avoid undue hardship;

---

was virtually identical to the FLSA's definition of the word "employ," see 29 U.S.C. § 203(g).

(ii) prevent the curtailment of employment opportunity; and

(iii) safeguard the minimum wage under this subtitle.

COMAR contains a chapter of regulations related to the MWHL, located at Title 09, Subtitle 12, Chapter 41. COMAR 09.12.41.10, concerning the hours of work, provides:

A. "Hours of work" means the time during a workweek that an individual employed by an employer is required by the employer to be on the employer's premises, on duty, or at a prescribed workplace.

B. Meal periods are included in computing hours of work if the individual is required to perform any duties during the meal period.

C. Travel time is included in computing hours of work if the individual:

(1) Travels during regular work hours;

(2) Travels from one worksite to another; or

(3) Is called out after work hours in emergency situations.

As to overtime compensation, COMAR 09.12.41.14A states:

A. An employee subject to the Minimum Wage Act of Maryland shall be paid overtime compensation for each hour worked in excess of 40 hours per workweek. This includes the following:

(1) All hours worked by an employee for an employer are included, even though the employee may perform work in two or more unrelated jobs;

(2) If the total workweek hours do not exceed 40, an employee is not entitled to overtime compensation for hours worked in excess of 8 on any day, including Saturday, Sunday, and holidays.

**Analysis**

As to the overarching question in the cases, we hold that, in Maryland, the PPA, in particular the exclusion of certain activities as compensable as set forth in 29 U.S.C. §

254(a), has not been adopted or incorporated into the MWHL, the MWPCL, or in COMAR. Since being enacted in 1965 and 1966 and in subsequent amendments, neither the MWHL nor the MWPCL has expressly adopted or incorporated the PPA. Indeed, neither the MWHL nor the MWPCL refers to or even mentions the PPA. The related COMAR regulations have also not expressly incorporated the PPA. We decline to read the General Assembly's silence on such a significant matter, such as incorporating into Maryland statutes a federal law that limits compensation for work, as dispositive of the General Assembly's intent to incorporate the PPA into Maryland law. Simply put, what constitutes "work" in Maryland is not limited to what is considered compensable work under the PPA. Accordingly, in the cases before us, the circuit court and the Court of Special Appeals erred in determining that the PPA had been made a part of Maryland law.

As explained above, after the Supreme Court's holdings that activities by employees, such as traveling in underground mines and being required to be on call as a firefighter, constituted work or employment within the meaning of the FLSA, Congress amended the FLSA by enacting the PPA to alleviate employers of liability for the failure to pay employees wages and overtime compensation for certain activities. In other words, the PPA limited the activities that constitute compensable work. In particular, 29 U.S.C. § 254(a) amended the FLSA to provide that an employer is not required to compensate an employee for "traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform" or for "activities which are preliminary to or postliminary to said principal activity or activities[.]"

In addition, a federal regulation promulgated after the enactment of the PPA

addressed preliminary and postliminary activities. See 29 C.F.R. § 790.7. The regulation explains that an activity that would constitute a preliminary or postliminary activity includes "riding on buses or trains from a logging camp to a particular site at which the logging operations are actually being conducted." 29 C.F.R. § 790.7(f). Under federal law preliminary and postliminary activities do not constitute compensable work. Thus, it is clear that, if the PPA were incorporated into Maryland law, Petitioners would not be able to be compensated for the time spent waiting and traveling between the Rosecroft parking area and the MGM Project construction site.

But, the PPA has not been adopted or otherwise incorporated in Maryland's wage enforcement laws. As with any matter involving statutory construction, we seek to ascertain and effectuate the General Assembly's intent, and we begin by first looking at the language of the statute at issue. See Lillian C. Blentlinger, LLC, 456 Md. at 294, 173 A.3d at 561 (citation omitted). Examining the plain language of the MWHL and MWPCL reveals that there is no reference or mention of the PPA, let alone any explicit adoption of the PPA as part of Maryland's wage enforcement laws. Neither the MWHL nor the MWPCL refers to the PPA or uses terms or phrases such as "principal activity," or "preliminary" or "postliminary to" principal activities—terms which, under the PPA, have the effect of limiting what constitutes compensable work.

Moreover, the MWHL defines the term "Federal Act" to mean "the federal Fair

Labor Standards Act of 1938." LE § 3-401(c).[17] The General Assembly did not define the term "Federal Act" to mean the FLSA, as amended by the PPA, even though the PPA was enacted nearly twenty years before the MWHL. Rather, the General Assembly defines "Federal Act" to include only the provisions of the FLSA and not the subsequent amendments of the PPA, which was a separate act. In contrast, after the PPA was passed, the Supreme Court has referred to the FLSA as "the Fair Labor Standards Act, as amended by the Portal-to-Portal Act," or some variation thereof. See, e.g., Steiner, 350 U.S. at 248 ("the Fair Labor Standards Act of 1938, as amended"); Mitchell v. King Packing Co., 350 U.S. 260, 260 (1956) ("the Fair Labor Standards Act, as amended by the Portal-to-Portal Act of 1947"); IBP, Inc., 546 U.S. at 24 ("the Fair Labor Standards Act of 1938 (FLSA), as amended by the Portal-to-Portal Act of 1947"); Integrity Staffing Solutions, Inc., 574 U.S. at 29 ("the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. § 29 201 et seq., as amended by the Portal-to-Portal Act of 1947, § 251 et seq.").

Plainly, the General Assembly knows how to define terms and to refer to other statutes in a manner that would demonstrate that it desires to incorporate a federal law into a Maryland statute, but tellingly when defining the term "Federal Act," the General Assembly did not indicate an intent to incorporate the PPA. Cf. Fuentes v. State, 454 Md. 296, 311, 164 A.3d 265, 274 (2017) ("The General Assembly knows how to explicitly incorporate definitions from other titles, yet did not do so here." (Citations omitted)). By

---

[17]In addition, in a footnote added by the publisher in West's Annotated Code of Maryland, the FLSA is cited as "June 25, 1938, ch. 676, 52 Stat. 1060, codified at 29 U.S.C.A. § 201 et seq." LE § 3-401(c) n.1.

not defining "Federal Act" to include the PPA and by not referring to the PPA or using critical terms from the PPA (which are also used in the related federal regulations) in either the MWHL or the MWPCL, the plain language of the statutes demonstrates that the PPA has not been adopted as Maryland law.

Likewise, COMAR 09.12.41.10, concerning hours of work—or any of the Maryland regulations in Title 09, Subtitle 12, Chapter 41 related to the MWHL, for that matter—does not refer to the PPA, let alone adopt the PPA as part of Maryland law.  Nor does COMAR 09.12.41.10 mention principal activity or preliminary or postliminary activities or otherwise incorporate 29 C.F.R. § 790.7, the federal regulation describing preliminary and postliminary activities for purposes of the PPA.  By contrast, other COMAR regulations in the chapter concerning the MWHL expressly incorporate definitions from federal regulations that are unrelated to the PPA.  See, e.g., COMAR 09.12.41.01 (providing that "administrative capacity" "has the meaning stated in 29 CFR §541.200 et seq."); COMAR 09.12.41.04 (providing that "directly and closely related" "has the meaning stated in 29 CFR §541.703 et seq."); COMAR 09.12.41.05 (providing that "executive capacity" "has the meaning stated in 29 CFR §541.100 et seq."); COMAR 09.12.41.13 (providing that "outside salesman" "has the meaning stated in 29 CFR §541.500 et seq."); COMAR 0.12.41.17 (providing that "professional capacity" "has the meaning stated in 29 CFR §541.300 et seq.").  With respect to COMAR 09.12.41.10, which is the Maryland regulation describing what constitutes hours of work in Maryland, the Department of Labor did not incorporate or mention any federal regulation pertaining to the PPA.  In other words, the Department of Labor did not tie the description of hours of work for an

- 40 -

employee in Maryland to only those activities that are identified as compensable under the PPA.

In sum, the plain language of the MWHL, the MWPCL, and COMAR demonstrate that the PPA has not been adopted or incorporated as part of Maryland law. There is no reference, mention, or citation to the PPA in the Maryland statutes or regulations. Critically, although the MWHL may be Maryland's counterpart of the FLSA, the General Assembly has not enacted an equivalent of the PPA in Maryland, and the General Assembly did not incorporate, either partially or entirely, the provisions of the PPA by reference.

Although the language of the MWHL, the MWPCL, and COMAR are clear and do not incorporate the PPA as part of Maryland law and what constitutes "work" in Maryland is not limited to what constitutes "compensable work" under the FLSA, as amended by the PPA, and our analysis on the matter could end here, it may be prudent to examine what we can glean of the legislative history of the Maryland wage enforcement laws. See Neal v. Balt. City Bd. of Sch. Comm'rs, 467 Md. 399, 415-16, 225 A.3d 66, 75 (2020). The legislative history of the MWHL and MWPCL is silent as to the PPA. Although the PPA was passed in 1947, nearly twenty years before the General Assembly enacted the MWHL and MWPCL, the General Assembly did not mention the PPA in either, and, instead expressly defined the "Federal Act" only as the FLSA, without reference to the PPA. Since their enactment in 1965 and 1966, respectively, the MWHL and the MWPCL have been amended over the decades, and at no point has the General Assembly amended the statutes to include the PPA or to add in any of the excluded activities set forth in the PPA.

As we have stated, silence "is not necessarily dispositive of legislative intent" and "when a statute is silent as to a particular issue, it is appropriate for the Court to consider legislative history." In re J.J., 456 Md. 428, 449, 174 A.3d 372, 384 (2017) (cleaned up). In this instance, the history of Maryland's wage enforcement laws does not evince an intent by the General Assembly to incorporate the PPA as part of Maryland law. Rather, by specifically omitting any reference or mention to the PPA and defining the "Federal Act" to mean the FLSA of 1938, the General Assembly demonstrated an intent not to incorporate the PPA into Maryland law. Even if there were doubt as to legislative intent, or where legislative intent is not clearly expressed, we do not read into the legislative history an intent that does not exist.

Reading Maryland's wage enforcement laws as silently or implicitly incorporating the PPA would undermine our process of statutory construction, pursuant to which "we neither add nor delete words to a clear and unambiguous statute to give it a meaning not reflected by the words that the General Assembly used or engage in forced or subtle interpretation in an attempt to extend or limit the statute's meaning." Lillian C. Blentlinger, Inc., 456 Md. at 294, 173 A.3d at 562 (citation omitted). To read the PPA into the statutes at issue would be to give the MWHL and MWPCL a meaning that is not present in the language of the statutes and to engage in a forced interpretation that would limit the meaning of compensable work in Maryland. We decline to do so. It does not make sense that the General Assembly would have silently or implicitly adopted or incorporated the PPA into Maryland law. That would mean that the General Assembly intended to have the PPA as part of Maryland law, but did not expressly state so and did not provide employees

and employers alike any notice as to what would or would not constitute compensable work. In our view, this is not something that the General Assembly would have done.

Although the MWHL may mirror the FLSA in many regards, particularly in establishing a minimum wage and requiring overtime compensation, the MWHL does not mirror the PPA by relieving employers of liability for the failure to pay employees minimum wages or overtime compensation for certain specified activities. The purpose and language of the MWHL are different from that of the PPA. Compare LE § 3-402, with 29 U.S.C. § 251. We would not agree that, by referencing the FLSA, the General Assembly also incorporated the PPA, unless the General Assembly were to state otherwise. The General Assembly's omission of any mention of the PPA speaks for itself and means that the PPA is not part of Maryland law. To conclude differently would be to require that the General Assembly expressly disavow the adoption or incorporation of federal laws or run the risk of being deemed to have incorporated the law in Maryland.

We are aware that in Poe v. IESI MD Corp., 243 Md. App. 243, 246, 250-51, 220 A.3d 333, 335, 337-38 (2019), in addressing whether an employer's computation of an employee's overtime compensation violated the MWHL, the Court of Special Appeals observed that "Maryland appellate courts have said that the [MWHL] is the 'State parallel' to the Fair Labor Standards Act and 'the state's equivalent' of the federal statute" and that "[f]ederal courts, applying Maryland law, have also recognized the similarity between the State and federal statutes." (Cleaned up). In Poe, 243 Md. App. at 250, 220 A.3d at 337, the Court of Special Appeals noted that Maryland had not adopted a statute or regulation equivalent to 29 C.F.R. § 778.112, a federal regulation that instructs employers on how to

compute wages and overtime compensation for day-rate employees. The employer

calculated the employee's overtime compensation by using 29 C.F.R. § 778.112, and the

employee disputed the calculation. See Poe, 243 Md. App. at 245, 220 A.3d at 334. Given

the lack of a Maryland statute or regulation concerning how an employer was to calculate

overtime compensation for a day-rate employee, the Court of Special Appeals posed two

questions:

> Does it mean that Maryland law forbids employers from using the federal
> regulation in computing overtime compensation for employees who are paid
> a day rate and that employers must use some other formula, more
> advantageous to employees? Or is the federal regulation persuasive authority
> as to how employers must compute overtime compensation under the related
> provisions of Maryland law?

Id. at 250, 220 A.3d at 337.

The Court of Special Appeals noted that the provisions at issue under the MWHL

and the FLSA were substantially similar, and that the federal regulation had been held to

be a permissible interpretation of the FLSA. See id. at 252, 220 A.3d at 338-39.[18] The

Court of Special Appeals concluded that, "[b]ecause the Maryland statute is the counterpart

to the Fair Labor Standards Act, the federal regulation is, therefore, persuasive authority as

to the correct interpretation of Maryland law." Id. at 252, 220 A.3d at 339. In this context,

---

[18]In Poe, 243 Md. App. at 251, 220 A.3d at 338, the Court of Special Appeals
recognized that, "in some instances, the language of the Maryland statute or regulations
may diverge from that of its federal counterpart, so that State and federal law lead to
different results." As one example, the Court explained that "time spent commuting to and
from work is not compensable under federal law, but it may be compensable under a
COMAR regulation that applies to certain State employees who travel between home and
a work site other than the office." Id. at 251, 220 A.3d at 338 (citation omitted). The Court
of Special Appeals did not suggest that Maryland appellate courts should follow or assume
that divergent federal law has been incorporated into Maryland statutes and regulations.

the Court of Special Appeals stated that it saw "no basis in the language of the Maryland statutes or regulations to conclude that Maryland law prohibits employers from relying on the federal regulation to compute overtime compensation for employees who are paid a day rate[,]" and held that an employer does not violate the MWHL if it uses the federal regulation to compute overtime compensation for a day-rate employee. Id. at 253, 220 A.3d at 339. In so holding, the Court of Special Appeals stated: "In this case, the relevant provisions of the Fair Labor Standards Act mirror those of the Maryland Wage and Hour Law." Id. at 254, 220 A.3d at 339.

At the risk of pointing out the obvious, Poe does not address any issue concerning whether Maryland has adopted or incorporated the PPA or whether the PPA is persuasive authority in how to interpret a statute from the MWHL. At bottom, Poe stands for proposition that, under certain circumstances, where the relevant statutory provisions of the MWHL mirror those of the FLSA, Maryland law does not necessarily prohibit an employer from relying on a federal regulation to calculate overtime compensation for day-rate employees. Critical to the outcome in Poe was that the relevant provisions of the FLSA and MWHL were substantially similar. In contrast, the provisions of the MWHL and the PPA are not substantially similar; there is no blanket provision in the MWHL that prohibits an employee from being compensated for wait and travel time.

We are also aware that in Comptroller of Md. v. Miller, 169 Md. App. 321, 351, 901 A.2d 229, 246 (2006), aff'd, 398 Md. 272, 920 A.2d 467 (2007), the Court of Special Appeals interpreted a Maryland regulation to conclude that commuting was preliminary to or postliminary to a State employee's principal activity and therefore not compensable. In

Miller, 169 Md. App. at 323, 901 A.2d at 230, an employee of the Comptroller of Maryland disputed the Comptroller's method of computing compensable work time where an employee travels from home directly to a remote work site rather than from home to the regularly assigned office. The employee contended that she was entitled to be compensated for all of her travel time, without deducting the time she normally spent commuting to the office, whereas the Comptroller argued that the employee was not entitled to compensation for time she would otherwise have spent commuting to the office. See id. at 323, 901 A.2d at 230.

The regulation at issue, COMAR 17.04.11.02, defined "work time" and omitted "commute time" from the definition, which the Court of Special Appeals stated suggested "that 'commute time' is not tantamount to work time." Id. at 351, 901 A.2d at 230. Citing 29 U.S.C. § 254(a)(2) of the PPA, the Court of Special Appeals noted that "preliminary activities, as described in the FLSA, are those activities which are engaged in before the threshold of, or entrance upon the day's principal activity." (Some citations omitted). The Court of Special Appeals reasoned that "Maryland law accommodates the FLSA's exclusion of commuting time as compensable[,]" and agreed with the employee that "there are circumstances in which state law goes beyond the FLSA, as recognized by the General Assembly when it explicitly stated that state employees are entitled to the greater of that which they are afforded by state or federal law. The FLSA is a floor, not a ceiling." Id. at 351, 901 A.2d at 246 (cleaned up). The Court of Special Appeals stated that "COMAR 17.04.11.02B explicitly contemplates compensation for State employees for certain preliminary and postliminary activities, granting the employee the time in excess of daily,

normal commute time when an employee travels between home and a work site other than the assigned office." Id. at 352, 901 A.2d at 246-47 (cleaned up).

In Miller, although the Court of Special Appeals discussed the PPA and concluded that the employee's commute time was not compensable under the PPA and that Maryland law "accommodates" the exclusion of commute time as compensable, the Court of Special Appeals did not hold that the PPA has been adopted or incorporated into Maryland through the MWHL or the MWPCL. Rather, the analysis in Miller hinged on the interpretation of COMAR 17.04.11.02B, a regulation not applicable or at issue in this case. The PPA was discussed only because the Comptroller raised the matter and relied "by analogy on 29 U.S.C. § 254(a)[.]" Miller, 169 Md. App. at 340, 901 A.2d at 240. Tellingly, on review in this Court, in addressing whether COMAR 17.04.11.02B entitled employees to be compensated for time spent traveling between home and a work site other than the assigned office, we did not refer to, cite, or otherwise mention the PPA or the FLSA. See Miller, 398 Md. 272, 920 A.2d 467. Rather, we focused on interpretation of COMAR 17.04.11.02B and another regulation, COMAR 23.02.01.01, which concerns mileage reimbursement to a State employee who uses a vehicle to conduct official business for the State. See id. at 283-85, 920 A.2d at 473-75.

Just as we decline to engraft the PPA into Maryland law, we observe that the Supreme Court of Pennsylvania recently held the same with respect to Pennsylvania law. In In re Amazon.com, Inc., 255 A.3d 191, 192 (Pa. 2021), the United States Court of Appeals for the Sixth Circuit certified two questions to the Supreme Court of Pennsylvania, including "whether time spent on an employer's premises waiting to undergo, and

- 47 -

undergoing, mandatory security screening is compensable as 'hours worked' within the meaning of the Pennsylvania Minimum Wage Act ('PMWA')[.]" (Footnote omitted). The Court answered that question "yes," holding that such time constitutes work under the PMWA. See id. at 193. In arriving at the answer, the Court explained that, in accord with the Pennsylvania "General Assembly's declared policy objective in enacting the PMWA, . . . when considering the question of whether an employee was entitled to compensation by an employer under the PMWA, or the manner in which an employee's compensation was to be determined thereunder," it had not followed "the interpretation of similarly applicable provisions of the federal FLSA." Id. at 201. The Court concluded that, in addressing whether time spent on the employer's premises for security screening constituted hours worked under Pennsylvania law, it was not bound by the Supreme Court's opinion in Busk, "which addressed the FLSA, and its P[]PA amendments." Id.

The Supreme Court of Pennsylvania found Busk not to be of persuasive value in interpreting the PMWA, where the analysis in Busk rested on interpretation of the PPA, which carves out preliminary and postliminary activities as not compensable under the FLSA. See id. The Court stated that it would not judicially engraft the PPA as part of the PMWA, explaining:

> Pennsylvania has never statutorily adopted the federal P[]PA's specific classification of certain employee activities as being exempt from compensation, even though the PMWA has been amended six times since its initial passage in 1968. Indeed, we perceive the legislature's decision not to adopt the P[]PA as wholly consistent with that body's clear and unequivocal policy statement statutorily expressed in the PMWA, that its overarching purpose is to address "[t]he evils of unreasonable and unfair wages," and to ameliorate employer practices which serve to artificially depress those wages. 43 P.S. § 333.101. Given that the federal P[]PA was explicitly

crafted by Congress to eliminate an employer's obligation under the FLSA to pay wages to its employees for certain enumerated activities, it operates to reduce the amount of wages an employee is entitled to receive for those activities, even if his employer compels him to perform them. Interpreting the federal P[]PA to have been, in effect, made part of the PMWA *sub silentio*, as the district court in this matter concluded it was, is incongruous with our legislature's expressly stated purpose for enacting the PMWA. Consequently, respecting the Pennsylvania legislature's evident policy choice not to make the P[]PA's statutory exclusion of certain employee activities from compensable time a part of the PMWA, we will not judicially engraft such provisions thereon.

Id. at 201-02 (footnote and citation omitted).[19]

With that said, we hold the PPA has not been adopted or incorporated into the MWHL, the MWPCL, or COMAR, and we decline to judicially engraft the provisions of the PPA onto Maryland law. The MWPCL requires that an employer pay an employee "wages," see LE §§ 3-502, 3-505, and defines "wage" as meaning "all compensation that is due to an employee for employment" and including a bonus, a commission, a fringe benefit, overtime wages, and any other remuneration promised for service. LE § 3-501(c). The term "employ" is defined for purposes of both the MWHL and MWPCL, to mean "to engage an individual to work" and includes "allowing an individual to work" and "instructing an individual to be present at a work site." LE § 3-101(c). The term "work" or "compensable work" is not defined in the MWHL, the MWPCL, or COMAR, but

---

[19]To be sure, the PMWA is a different statutory scheme than the MWHL. We note, however, that although the PMWA does not include the term "Federal Act" in its definition section, see 43 Pa. Stat. and Cons. Stat. Ann. § 333.103, the PMWA refers generally to "the Fair Labor Standards Act of 1938 (52 Stat. 1060, 29 U.S.C. § 201 et seq.)" in Pa. Stat. and Cons. Stat. Ann. § 333.104(a.1) and refers to specific sections of "the Fair Labor Standards Act of 1938" in other locations, see 43 Pa. Stat. and Cons. Stat. Ann. § 333.104(c), (d).

COMAR 09.12.41.10 describes "hours of work."

COMAR 09.12.41.10 does not adopt the restrictions in the PPA limiting compensable work or hours of work to the performance of principal activities during employment and does not broadly exclude activities such as traveling. COMAR 09.12.41.10 provides a greater scope of compensation by stating that hours of work means time that an employee "is required by the employer to be on the employer's premises, on duty, or at a prescribed workplace" and includes certain travel time. COMAR 09.12.41.10 describes what constitutes "work" in Maryland and means what it says. As such, we must next turn to the issue of whether Petitioners are entitled to compensation under Maryland law.

## II. COMAR 09.12.41.10

### The Parties' Contentions

Petitioners contend that, in Maryland, a "worksite" is a location where an employer exercises control over an employee's time or requires the employee to report. Petitioners assert that, contrary to the Court of Special Appeals's determination, under Maryland law, a "worksite" is not limited to a place where an employee is performing a job function or principal activities of employment. Petitioners maintain that, rather, a worksite under Maryland law includes a location where an employer exercises "some control" over an employee.

Petitioners argue that the Court of Special Appeals incorrectly determined that a worksite is limited to a location where an employee performs a job function or performs work and erred in concluding that Rosecroft was not a worksite. Petitioners assert that,

under COMAR 09.12.41.10, they are entitled to wages for their travel time, including wait time, between Rosecroft and the MGM Project construction site. Petitioners maintain that, assuming there were disputes of material fact concerning matters such as whether Rosecroft was a worksite, the degree of control exercised by Respondents over them at Rosecroft, and whether Petitioners were required to report to Rosecroft, the circuit court erred in granting summary judgment in Amaya and in granting the motion for judgment in Rojas and not allowing the questions to be resolved by the jury.

In Amaya, DGS responds that the Court of Special Appeals correctly determined that Rosecroft was not a worksite under the MWHL. DGS contends that the plain meaning of "worksite" is a place where an employee performs job duties. DGS argues that the common meaning of "worksite" does not include a parking lot located miles away from where construction work occurs and where no work duties are performed. DGS asserts that because the term "worksite" would not include Rosecroft, the time that Amaya and Gonzalez spent traveling between Rosecroft and the MGM Project constitution site would not constitute compensable travel time under COMAR 09.12.41.10.

DGS contends that the definition of "worksite" adopted by the Court of Special Appeals—a location where an employee performs job functions—conforms with Maryland law. DGS maintains that Amaya's and Gonzalez's request to create "a control test" to determine what constitutes compensable work in Maryland would require action by the General Assembly. DGS states that Amaya and Gonzalez "did not perform any part of their job functions or any activity that was integral and indispensable to the principal duties of their job to work construction at Rosecroft," and that, as such, their travel time between

Rosecroft and the MGM Project construction site is not compensable under the MWHL.

In Rojas, F.R. and Commercial respond that, under the plain language of the relevant statutes and regulations, Rojas and Torres were not required to be paid for time spent parking or shuttling from Rosecroft to the MGM Project construction site. F.R. and Commercial contend that the words "worksite" and "workplace" mean a location where an employee performs work, and that Rojas and Torres did not perform any work at Rosecroft or on the buses. F.R. and Commercial argue that the time claimed by Rojas and Torres does "not constitute 'hours of work' for which wages were required to be paid under the MWHL or the MWPCL" and instead was part of a commute, which is not compensable. (Citations omitted). F.R. and Commercial assert that nothing in the MWHL nor COMAR refers to control for determining whether a location is a worksite.

### COMAR 09.12.41.10 – Hours of Work

Having concluded that the PPA has not been implicitly or silently incorporated by the General Assembly into the MWHL or the MWPCL and that the Commissioner of the Department of Labor has not done the same with COMAR regulations, the question of whether Petitioners engaged in hours of work under COMAR 09.12.41.10, and, as such, are entitled to compensation under Maryland law is squarely before us. It is a given that, under the PPA, time an employee spends traveling to and from a place where the employee's principal work activities are performed is not compensable. As such, applying federal case law, here, would necessarily lead to the conclusion that a worksite would be a location where an employee is required to perform designated job functions, *i.e.*, engage in principal activities for which the employee is employed to perform. In light of our holding

- 52 -

above, we will not look to federal case law interpreting the PPA to construe language in COMAR 09.12.41.10.

In Amaya, id. at 481-82, 246 A.3d at 627-28, in concluding that the workers were not entitled to compensation for wait and travel time, the Court of Special Appeals discussed Hausfeld v. Love Funding Corp., 131 F. Supp. 3d 443 (D.Md. 2015) and Himes Assocs., Ltd. v. Anderson, 178 Md. App. 504, 943 A.2d 30 (2008). In addressing the District Court's holding in Hausfeld, the Court of Special Appeals stated: "As in *Himes*, the District Court found that the locations were worksites not because the employer required the employee to go to the site, but because the employee performed work at the sites." Amaya, 249 Md. App. at 481, 246 A.3d at 628. But, neither the District Court in Hausfeld nor the Court of Special Appeals in Himes concluded that a location was a worksite because an employee performed work at the location but not because the employee was required by the employer to go to the location.

In Hausfeld, 131 F. Supp. 3d at 447, an employee brought an action against his former employer under the MWPCL and for breach of contract alleging the failure to pay commissions. The employer was a Virginia mortgage banking company and the employee had worked as a loan originator for the company. See id. The issue in the case was whether an employee who works for an out-of-state company can be considered as employed in Maryland under the MWPCL. The District Court concluded that the Virginia company was an employer under the MWPCL and that the MWPCL applied. See id. at 455. In considering whether the company was an employer for purposes of the MWPCL, the District Court explained that all that is required is that the employee worked to some extent

in Maryland.  See id.  The District Court stated that the employee's "involvement across borrowers, events, and site visits" in Maryland was sufficient to meet the threshold of employment in the State.  Id. at 456.  The District Court's holding in Hausfeld did not address the question of whether an employee must actually perform job functions at a location as opposed to being required to go to a location or be on duty in order to be considered to have engaged in work under the MWPCL or COMAR.

Insofar as Himes is concerned, the same can be said.  In Himes, 178 Md. App. at 512, 943 A.2d at 34, an employee filed suit against his former employer, a Virginia corporation, for violation of the MWPCL and breach of contract.  The case involved issues of personal jurisdiction over the employer and whether the employer could be subject to liability under the MWPCL.  See id. at 512, 943 A.2d at 34.  What the case did not involve was the issue of whether a location could be found to be a worksite or workplace based on the employee having performed work duties as opposed to being required to be at the location.  The Court of Special Appeals held that the employee was not prohibited from filing a claim under the MWPCL for unpaid wages in Maryland because the plain language of LE § 3-101[20] addresses the situation in which a company outside of Maryland instructs its employee to go to a work site in Maryland.  Himes, 178 Md. App. at 535, 943 A.2d at 48.  The Court of Special Appeals noted that LE § 5-101 defines an employer to include any person who employs an individual in the State and that LE § 3-101 provides: "Employ means to engage an individual to work. . . . Employ includes: (i) allowing an individual to

_____

[20]LE § 3-101 defines the term "employ" and applies to both the MWHL and MWPCL.

work; and (ii) instructing an individual to be present at a work site." Himes, 178 Md. App. at 535, 943 A.2d at 48 (cleaned up) (ellipsis in original).

In Himes, based on these statutory provisions, the Court of Special Appeals upheld the employee's ability to file a claim under the MWPCL even though the employer was located in Virginia. To be certain, the Court of Special Appeals stated that, as part of the employee's "function as a project manager[,]" the employee "had to attend meetings twice a month at Lockheed Martin's Baltimore office, in the State of Maryland." Id. at 535, 943 A.2d at 48. The Court of Special Appeals stated that, "[o]n that evidence alone," the company was an employer under the MWPCL. Id. at 535, 943 A.2d at 48. The Court of Special Appeals reached no conclusion with respect to whether the employee was required to perform the principal activities of employment, but rather determined that an action could be brought against an out-of-state employer under the MWPCL because, at a minimum, the employee had attended meetings in Maryland. If anything, the holdings in Hausfeld and Himes, although not directly addressing the issue before us, would lead to the conclusion that an employee being required by an employer to report to a designated location is a sufficient basis on which to conclude that the employee engaged in hours of work under COMAR 09.12.41.10. In neither case did the District Court or the Court of Special Appeals mandate that the employee must demonstrate having been required to actually perform prescribed duties or work functions at a location in Maryland in order to establish having worked in the State.

Under the plain language of COMAR 09.12.41.10A, the term "hours of work" means the time during a workweek that an employee is required by an employer to be "on

- 55 -

the employer's premises, on duty, or at a prescribed workplace." This language provides three circumstances under which an employer's requirement results in hours of work for an employee—namely, an employee being required to be (1) on the employer's premises, (2) on duty, or (3) at a prescribed workplace. Thus, an employee could engage in hours of work as a result of being required to be on duty at a location other than a prescribed workplace and by being required to be on the employer's premises, which may or may not be a prescribed workplace. Given this, it would be inconsistent with the plain language of the COMAR provision to require that an employee be engaged in the performance of actual physical labor or the performance of the principal work activities of employment in order to be compensated for hours of work. Under COMAR 09.12.41.10A, it is sufficient that the employer require the employee to be on duty, on the premises, or at a prescribed workplace. In these cases, whether Respondents required Petitioners to be either on Respondents' premises, on duty, or at a prescribed workplace would be factual matters to be determined by the trier of fact, *i.e.*, the jury.

In addition, under COMAR 09.21.41.10C(2), travel time from one worksite to another is included in hours of work. If hours of work under COMAR 09.21.41.10A necessarily include time that an employee is required to be on an employer's premises, on duty, or at a prescribed workplace, it follows that hours of work would include time that an employee spends traveling from one prescribed workplace or location on which the employee is required to be on duty or required to be on the employer's premises to another such location. As such, a worksite would include a prescribed workplace, an employer's premises, or a location where an employee is on duty if the employee is required during

- 56 -

work hours by the employer to be at the location. Thus, the question of whether Rosecroft is a worksite under COMAR 09.12.41.10C(2) is intrinsically tied to the definition of hours of work set forth in COMAR 09.12.41.10A.

In our view, there are genuine disputes of material fact as to whether in using the parking area at Rosecroft, Petitioners were required to be on Respondents' premises or on duty or at a prescribed workplace, such that the time spent waiting and traveling from Rosecroft to the MGM Project construction site constituted hours of work and travel from one worksite to another. On this record, even though Amaya and Gonzalez allege that DGS conceded that they were required to use the parking lot at Rosecroft, we make no determination as to whether DGS has made a such concession. Whether Amaya and Gonzalez were required to use the parking lot at Rosecroft and whether DGS has conceded as much are disputes of material fact and the circuit court erred in granting summary judgment in DGS's favor. As to the Rojas case, although there was no alleged concession by F.R. and Commercial that the Rojas and Torres were required to be present at Rosecroft, there was evidence that Rojas and Torres could not access the construction site by any means other than reporting to Rosecroft and taking a bus to the construction site. In that respect, there was evidence that was legally sufficient to generate a question for the jury such that the motion for judgment at the conclusion of Rojas's and Torres's case should have been denied.

### III. The Unjust Enrichment Claim in the Rojas Case

The circuit court granted judgment in favor of F.R. and Commercial as to Rojas's and Torres's claim for unjust enrichment. Rojas and Torres contend that F.R. and

Commercial moved for judgment only as to the statutory wage claims and that the elements of the unjust enrichment claim are different from those of the wage claims. For their part, F.R. and Commercial counter that, because wait and travel time is not compensable, there was no benefit accepted or retained by them which would give rise to a claim for unjust enrichment. In Hill v. Cross Country Settlements, LLC, 402 Md. 281, 295, 936 A.2d 343, 351 (2007), we explained that to prevail on a claim of unjust enrichment, a plaintiff must satisfy the following three elements:

1. A benefit conferred upon the defendant by the plaintiff;

2. An appreciation or knowledge by the defendant of the benefit; and

3. The acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value.

(Citation omitted).

The issue of whether F.R. and Commercial received a benefit under inequitable circumstances due to Rojas and Torres using the parking area and taking buses to the construction site turns on whether the workers were entitled to be paid for wait and travel time. The unjust enrichment claim would be viable only to the extent that Rojas and Torres were entitled to be compensated but were not. Given our holding that the PPA has not been incorporated as part of Maryland law and that what constitutes compensable work under the PPA is not controlling in Maryland, we conclude that just as the circuit court erred in granting judgment as to the wage claims on the basis that travel time is not compensable, the circuit court erred in granting judgment as to the unjust enrichment claim and the Court of Special Appeals erred in affirming the judgment.

**IN CASE NO. 14, JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. RESPONDENTS TO PAY COSTS.**

**IN CASE NO. 17, JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. RESPONDENTS TO PAY COSTS.**