*In the Matter of Morgan Stanley and Co. Inc., et al*, No. 1554, September Term, 2022. Opinion by Graeff, J.

**WORKERS' COMPENSATION**

To obtain compensation for an occupational disease in a workers' compensation case, under Md. Code Ann., Labor & Empl. ("LE") § 9-502(d)(1)(ii), the employee must prove exposure to a biological, chemical or physical agent that is a distinctive feature of the type of work performed, as opposed to a specific condition at the employee's particular workplace. Exposure must be a recognized risk of employment, "[i]t is not enough that the ailment is caused by the specific place in which the claimant happens to work." *Dando v. Binghamton Bd. of Educ.*, 490 N.Y.S.2d 360, 361 (N.Y. App. Div. 1985).

Claimant's pneumonitis, which was alleged to be caused by exposure to mold in an office setting, was not attributable to claimant's type of employment as a financial advisor, which involved primarily discussing and advising clients regarding their financial situation and potential investments. There was no evidence that mold exposure is a known risk or distinctive feature of the job of a financial advisor.

Circuit Court for Anne Arundel County
Case No. C-02-CV-19-004073

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1554

September Term, 2022

_____

IN THE MATTER OF MORGAN STANLEY
AND CO. INC., ET AL.

_____

Graeff,
Reed,
Taylor, Robert K., Jr.
        (Specially Assigned),

JJ.

_____

Opinion by Graeff, J.

_____

Filed: May 30, 2024

* Beachley, J., and Zic, J., did not participate in
the Court's decision to designate this opinion for
publication pursuant to Md. Rule 8-605.1.

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

In November 2019, the Maryland Workers' Compensation Commission (the "Commission") issued a decision finding that Henry Gundlach, appellee, had "sustained an occupational disease of pneumonitis (lungs) arising out of and in the course of employment" as a financial advisor for Morgan Stanley & Co., Inc. ("Morgan Stanley"), one of the appellants. The Commission found that Mr. Gundlach had an average weekly wage of $6,730.27, and it ordered Morgan Stanley and its insurer, Indemnity Insurance Company of North America, also an appellant, to pay Mr. Gundlach's causally related medical expenses. It further ordered that the case be held for consideration whether Mr. Gundlach had sustained permanent partial disability.

Appellants sought judicial review of the Commission's decision, and the case was tried before a jury in the Circuit Court for Anne Arundel County. Appellants moved for judgment at the close of all the evidence, arguing that, as a matter of law, Mr. Gundlach did not sustain an occupational disease compensable under the Maryland Workers' Compensation Act (the "Act"), Md. Code Ann., Lab. & Empl. ("LE") §§ 9-101 to 9-1201 (2016 Repl. Vol.). The court denied the motion, and the jury returned a verdict in favor of Mr. Gundlach. The court then issued an order affirming the Commission's order.

On appeal, appellants present the following question for this Court's review, which we have rephrased slightly, as follows:

> Did the circuit court err in denying appellants' motion for judgment at the close of all the evidence, given the limitation on liability for occupational diseases set forth in LE § 9-502(d)(ii)?

> For the reasons set forth below, we shall reverse the judgment of the circuit court.

FACTUAL AND PROCEDURAL BACKGROUND

## I.

### Proceedings Before the Commission

Mr. Gundlach had been a financial advisor for Morgan Stanley since 2008. He worked in Morgan Stanley's branch office in Annapolis, Maryland, earning approximately $6,730 per week. His last day of work after developing pneumonitis was Friday, May 2, 2019.

On May 29, 2019, Mr. Gundlach filed two claims with the Commission: (1) Claim No. W124495, for occupational disease; and (2) Claim No. W124496, for accidental injury. In support of both claims, Mr. Gundlach alleged that he was exposed to mold in his workplace, and as a result, he developed pneumonitis.[1]

On November 21, 2019, the Commission held a hearing. Counsel for Mr. Gundlach amended Mr. Gundlach's date of disablement from May 3, 2019, to May 3, 2018.

Mr. Gundlach testified that, during the time he was a financial advisor for Morgan Stanley, he worked in two offices, one located in Building B, for six and a half to seven years, and then a different office, located in Building A, for another three and a half years. Mold was discovered in his second office after Morgan Stanley inspected below the baseboards. Mr. Gundlach testified that his first office was never inspected visually for mold. He was alleging, however, that exposure in his first office contributed to his pneumonitis. He never saw mold in that office, but he saw water damage in the first office

---

[1] Stedman's Medical Dictionary defines "pneumonitis" as: "Inflammation of the lungs." *Pneumonitis*, Stedman's Medical Dictionary (West 2014).

"usually around the inside of the doors." He also noticed that ceiling tiles were stained with water. In the second office, he also noticed dampness after storms.

In 2012, Mr. Gundlach started having respiratory problems. Later that year, he began seeing his regular doctor due to a persistent cough. During the visits with his doctor, "this cough was a recurrent theme." His doctor ordered a chest x-ray on April 2, 2014, which revealed "pulmonary infiltrates." The radiologist's impression was that Mr. Gundlach had "nonspecific chronic interstitial fibrosis."

In April 2014, Mr. Gundlach began to see Dr. Nevins Todd, a pulmonologist. During his visits with Dr. Todd, they would "go through environmental type things," attempting to identify what could be causing his respiratory problems. Mr. Gundlach did not have any history of smoking. Although he had a history of asbestos exposure, his doctor had "ruled that out a long time ago," stating that his respiratory problems had "nothing to do with mesothelioma" because the scans did not "show anything like the same patterns."

Dr. Todd told Mr. Gundlach that exposure to bird feathers, including down feathers, could be causing his respiratory problems. Mr. Gundlach "had used, for many years off and on, a feather pillow." When he got married in 2015 and his wife moved into his home in Crownsville, Maryland, she brought with her five pieces of furniture that contained down feathers. Two years later, in 2017, Dr. Todd instructed Mr. Gundlach to remove the furniture from his home. Mr. Gundlach had the furniture removed immediately, and he limited "all feather exposure," but his symptoms persisted.

3

In April 2017, Dr. Todd started discussing with Mr. Gundlach the possibility that exposure to mold could be causing his cough. Mr. Gundlach had his home tested for mold in January 2018, but the results were negative. Approximately two months later, in March 2018, Mr. Gundlach asked Dr. Todd whether he should have his office tested for mold. Dr. Todd stated: "[W]ell, if they'll let you." Mr. Gundlach then asked Morgan Stanley to have his office tested for mold, and it agreed.

Sometime after Morgan Stanley tested Mr. Gundlach's office for mold, Mr. Gundlach learned that the results were positive. The testing confirmed that "there was visible mold growing in [his] office." Mr. Gundlach then asked Morgan Stanley for permission to work from home, and it agreed.

On May 3, 2018, Mr. Gundlach started working from home. Within two weeks, he started "subjectively feeling enormously more energy," and he no longer felt like he wanted to sit in a chair all day. After working from home for approximately two months, testing revealed an increase in his pulmonary function. In January 2019, however, Mr. Gundlach contracted bronchitis, and subsequent testing revealed a decrease in his pulmonary function. After that, he continued to decline. On cross-examination, Mr. Gundlach testified that, approximately five months before the hearing, he had consulted with a doctor regarding a possible lung transplant. In closing arguments, counsel for the parties argued with respect to whether the level of mold in Mr. Gundlach's office rose to the level needed to create a causal relationship between the disease and the employment.

After the hearing, the Commission issued an order in Claim No. W124495, finding that Mr. Gundlach had "sustained an occupational disease of pneumonitis (lungs) arising

4

out of and in the course of employment." It ordered appellants to pay Mr. Gundlach's causally related medical expenses. It further ordered that the case would be held for further consideration as to whether Mr. Gundlach had sustained permanent partial disability. The Commission also issued an order in Claim No. W124496, finding that Mr. Gundlach had not sustained an accidental injury arising out of his employment.[2]

## II.

## Proceedings in the Circuit Court

On December 18, 2019, appellants filed a petition in the Circuit Court for Anne Arundel County, seeking judicial review of the Commission's decision in Claim No. W124495, finding that Mr. Gundlach sustained an occupational disease of pneumonitis (lungs) arising out of and in the course of employment. On November 22, 2021, appellants unsuccessfully moved for summary judgment, and the case was tried before a jury.

Trial began on October 6, 2022. In opening statement, counsel for appellants stated that Morgan Stanley was not disputing that Mr. Gundlach had a serious medical condition, but the issue was whether his condition was related to his employment. Counsel noted that the Commission had rejected Mr. Gundlach's claim for "accidental injury as an alternate theory of compensability." Mr. Gundlach did not appeal that decision, and the issue of accidental injury was not before the jury. Counsel stated that Mr. Gundlach's pneumonitis was not an occupational disease because mold in his workplace did not cause his condition,

---

[2] On appeal, appellants state that Mr. Gundlach's exposure "may have been compensable as an accidental injury as an injurious exposure, something unanticipated and unexpected occurring in a particular workplace that was found to cause injury, despite the Commission's rejection of that theory and Appellee's non-appeal of that decision."

and pneumonitis is "not consistent with exposure that is attributable to his type of employment as a financial advisor."

Counsel for Mr. Gundlach stated in his opening statement that "employers and their insurance companies must provide worker's compensation benefits when a working person becomes incapacitated . . . because of a disease that results from the place where they work." He stated that Morgan Stanley had to prove that the Commission was wrong in finding that Mr. Gundlach suffered an occupational disease, which it could not do.

## A.

### Testimony of Dr. Ross Myerson

Dr. Ross Myerson, an expert in occupational and environmental medicine, testified that, at the request of appellants' counsel, he performed an independent medical examination ("IME") on Mr. Gundlach in October 2019. During the IME, Mr. Gundlach told Dr. Myerson that he developed a "persistent dry cough" in 2012. Two years later, after undergoing a chest x-ray and CT scan, Mr. Gundlach saw a pulmonologist at the University of Maryland Medical Center, Dr. Nevins Todd. Mr. Gundlach advised Dr. Myerson that "he had lung problems due to hypersensitivity pneumonitis," which was characterized as "an inflammation of the lungs, usually related to an allergic component." In 2018, Mr. Gundlach "began working exclusively from home at which time he noted a reduction in cough and his shortness of breath at night." Mr. Gundlach informed Dr. Myerson that he "felt better when his pulmonary function studies improved."

During the IME, Mr. Gundlach told Dr. Myerson that, in December 2013, "he and his wife got rid of any furniture with [d]own filling in their apartment." After they removed

6

the furniture, Mr. Gundlach did not have any change in his symptoms. Mr. Gundlach also told Dr. Myerson that "the building that he worked in had numerous incidents of water intrusions."

Dr. Myerson reviewed Mr. Gundlach's medical records as part of the IME. A report from Dr. Todd dated September 30, 2014, reflected that Mr. Gundlach had interstitial lung disease. A report dated December 2, 2016, stated that Mr. Gundlach "was experiencing worsening cough and shortness of breath."

A report from Dr. Todd dated February 28, 2017, reflected that Mr. Gundlach "was doing mildly better on CellCept and prednisone." All furniture containing down had been removed from Mr. Gundlach's home, and "other than [d]own furniture, all other social/environmental/and occupational histories [were] unrevealing." The report noted that a broad-spectrum hypersensitivity pneumonitis panel was performed on Mr. Gundlach, which yielded positive results for "several molds including pigeon feathers." These results were "the best evidence for a potential cause of the interstitial lung disease." The report noted, however, that Mr. Gundlach "feels substantially better out of the workplace," and "chronic hypersensitivity pneumonitis is the doctor's best medical judgement if true exposure to mold in the workplace could be an issue."

A report from Dr. Todd dated September 24, 2018, stated that Mr. Gundlach continued to do well, and he felt "substantially better" out of the workplace. He left his workplace in 2018. He was walking several miles daily around the Naval Academy in Annapolis without oxygen supplementation, and he continued taking prednisone. Dr. Todd noted that "it remains unknown if true exposure from mold in the workplace could be an

issue." He noted in this regard that "the chronic hypersensitivity pneumonitis is the doctor's best medical judgement."

A report from Dr. Todd dated March 14, 2019, stated that Mr. Gundlach had been out of the workplace for approximately one year. Mr. Gundlach reported "dramatic improvement in his health since he began working from home," but his cough and shortness of breath had persisted. Dr. Todd noted that Mr. Gundlach's disease "continues to look like idiopathic pulmonary fibrosis with subfloral scarring." A broad-spectrum hypersensitivity pneumonitis panel had been performed on Mr. Gundlach, which "was positive for several molds and for pigeon feathers." He stated that Mr. Gundlach's "pulmonary disease seems to coincide with environmental exposures. Either at the workplace or at home."

In July 2019, Dr. Todd noted in a report that Mr. Gundlach had traveled to Europe in the spring of that year and "did okay on the trip." Mr. Gundlach still had the same carpet in his basement, but Mr. Gundlach did not think that there was any sort of water intrusion problem or mold problem in the home. Mr. Gundlach continued to drink alcohol daily, but he had "cut back significantly." Mr. Gundlach had consulted with another physician for lung transplant services.

Dr. Myerson testified that, as part of the IME, he reviewed the reports of the environmental quality inspections of the office, which were performed in this case. A report from Rafferty & James, Inc., dated April 30, 2018, reflected that Morgan Stanley's office complex was inspected for mold. The report noted the following in Mr. Gundlach's office:

[T]here had been visual indication of past moisture intrusions revealing small amounts of apparent mold growth on a wall board at the bottom of the [perimeter] along the northeast wall. Active mold was found on the wall . . . behind a vinyl cove base in two locations in one 5x5 inch area in Mr. Gundlach's room in the far left corner and another 3x8 inch area entering the conference room in the north corner of the suite.

Findings from the inspection, however, "were not consistent with any significant mold amplification inside of the building." Dr. Myerson stated: "[M]old is ubiquitous, it is found everywhere. Mold and mold spores comprise a huge percentage of the entire biomass of the Earth." When asked whether mold in offices was dangerous, Dr. Myerson testified that it depended on "what mold and what quantity."

Dr. Myerson testified that he performed a physical examination on Mr. Gundlach as part of the IME. The examination took approximately 20 minutes to complete. He listened to Mr. Gundlach's lungs with a stethoscope and "found bilateral inspiratory and exploratory [sic] crackles in all lung fields."

Based on the physical examination and the records he reviewed as part of the IME, Dr. Myerson found "convincing evidence" that Mr. Gundlach had pulmonary fibrosis that "was not related to employment as a financial advisor at Morgan Stanley." Dr. Myerson's impression was that the pulmonary fibrosis was caused by hypersensitivity pneumonitis, which was "more likely related to exposures outside of the work place." Dr. Myerson found that "Mr. Gundlach had a progressive pulmonary condition and will require ongoing treatment[,] but such treatment was not related to his employment." Dr. Myerson set forth his findings in a report, dated June 10, 2021, which was admitted into evidence.

9

Dr. Myerson testified that he had seen governmental studies from the Department of Labor correlating "certain occupations to certain diseases." In his review of the medical literature, he had not found anything that would show that pneumonitis sensitivity, or pulmonary fibrosis, were due to the occupation of a financial advisor. In his opinion, to a reasonable degree of medical probability, the occupation of a financial advisor is not the type of work that would lead to pneumonitis or involve exposures to pulmonary toxicants.

On May 14, 2020, Mr. Gundlach underwent a bilateral lung transplant.[3] On May 15, 2020, a lymph node biopsy was performed. It demonstrated "granulomatous inflammation seen in association with what appeared to be Histoplasma," a fungus associated with birds, bird feathers, and bird droppings. The lymph node biopsy was significant because the lymph node was positive for a specific fungus that was not seen in any of the environmental studies done in Mr. Gundlach's office or place of employment. Mr. Gundlach had alternate exposure to bird feathers and bird droppings, including the feathers in his down furniture and pillow, as well as a bird feeder that he filled, which risked exposure to bird droppings containing the Histoplasmosis spores. When asked whether there are occupations associated with Histoplasmosis, Dr. Myerson answered in the affirmative, stating that it is associated with poultry workers, bird keepers, and workers who "go into caves where bats are." Dr. Myerson testified that the information from the lymph node biopsy led him to believe that Mr. Gundlach had hypersensitivity pneumonitis

_____

[3] Dr. Myerson testified that "surgeons won't do that kind of procedure unless it is indicated[,] and it would have to be indicated by . . . severe progressive impairment of lung function."

associated with exposure to spores of Histoplasma that are found in bird droppings and in feathers.[4]

## B.

### Testimony of Jed Woelfle

Jed Woelfle, a managing director for Morgan Stanley, testified that he oversaw Morgan Stanley's branch office in Annapolis from 2016 to 2020.[5] When Mr. Gundlach made his complaints about the problems in the Annapolis branch office, Morgan Stanley took his complaints seriously, investigated them, and remediated.

No employee at the Annapolis branch office, other than Mr. Gundlach, had made an occupational disease claim regarding any type of lung condition, including other employees who sat in the office that Mr. Gundlach had previously occupied. He was not aware of any Morgan Stanley employee, other than Mr. Gundlach, with alleged pulmonary complaints related to the Annapolis branch office.

## C.

### Testimony of Henry Gundlach

Mr. Gundlach testified that he started working as a financial advisor for Morgan Stanley in December 2008. His job involved finance, banking, and sales. A job description

---

[4] Mr. Gundlach testified that the biopsy to which Dr. Myerson testified was from the donor lung, not from his lungs.

[5] On cross-examination, Jed Woelfle testified that, although he oversaw Morgan Stanley's branch office in Annapolis from 2016 to 2020, he was not at the Annapolis office every day. He was there approximately eight times a year, including one day each quarter and more frequently in the summer.

for the position of a financial advisor stated: "Financial Advisors are responsible for assessing a client's circumstances and objectives, and based on those, go on to provide individualized highly strategic [i]nvestment consulting." When asked whether there was "anything about the job, itself, the duties of a financial advisor, a senior vice president, a portfolio manager, that would cause [him] to have pneumonitis," Mr. Gundlach answered: "No."

On cross-examination, Mr. Gundlach testified that having an office was an integral part of his job, stating that, as a financial advisor, "the office was the base of operations. It is where you are supervised." His office was where his desk, records, and phone were located, and a lot of his job "was spent conversing with clients on the telephone." He testified in this regard, as follows:

> One of the cardinal rules of our business is doors are always, you know, open so compliance officers can come by and if they choose to listen in to what you are communicating with clients, your records are there. Most of your research is available there.

*     *     *

> So it was just the place of accessibility. We had two wide screens in front of us to help monitor the client accounts and to monitor what the markets were doing. So we spent the majority of our time, from the morning when I got there and I would usually arrive at about 6:30, seven o'clock in the morning until I left usually shortly after four o'clock in the office.

Mr. Gundlach completed a questionnaire in 2018 when the environmental quality inspection was performed in Morgan Stanley's office complex. Mr. Gundlach stated: "My health issue appears to be related to exposure to irritants that my lungs react to. Two known irritants are feathers and mold. Those emit spores that damage my lung function."

Mr. Gundlach read to the jury an email he sent to his primary doctor on January 7, 2017. Mr. Gundlach stated:

> Just updating on diagnosis and treatment changes. . . . Dr. Todd is now highly suspicious . . . that I have hypersensitivity pneumonitis. The sensitivity is to down feathers. This fits the initial onset. My coughing first began after I separated from then wife and moved into a small, unventilated apartment at the town center. I bought a new down pillow, a new comforter, decorative . . . down pillows and brought a down sofa into the place. I remember coughing mostly at night and even using a humidifier at night. It was all the dry air affecting my sinuses.
>
> When I moved back into my home, which is better ventilated, I was less surrounded by down, my lung function stabilized. Then after remarriage [almost] all of my wife's furnishings were down stuffed. We purchased new down furnishings from Restoration Hardware and I started sitting in a down chair every night and my lung function started deteriorating again.
>
> I am now on prednisone and CellCept.

Mr. Gundlach testified that he had a history of keeping bird feeders, and at the time of trial, he still had a bird feeder in the backyard of his home.

Mr. Gundlach also read into evidence a progress note from Dr. Todd, dated October 17, 2017, which contained information from an email that he had previously sent to Dr. Todd:

> We visited friends in [Delaware] and I notice[d] on Thursday and Friday when we sat in their living room that I coughed a lot. Thursday we were in there [the] longest and I clearly was reacting [to] like an allergy, coughing and even feeling my [throat] constricting a bit. They have [three] cats and thought it might be that. They know I [cannot] be around feathers and were certain they had none in their house. On Friday when my cough again increased while sitting in the living room, for the heck of it we checked. Sure enough, a mixture with down! So it is 100% certain that feathers are a factor. When I would go up to bed my symptoms stopped. Congestion disappeared.

13

On cross-examination, Mr. Gundlach testified that Dr. Myerson's previous testimony regarding the lymph node biopsy was inaccurate. Mr. Gundlach denied having a biopsy of his lymph node done after the lung transplant. He stated that the lymph node discussed by Dr. Myerson was that of the donor. Mr. Gundlach had to receive "special" antifungal medicines while he was in the hospital to prevent his lungs from rejecting the donor's lung because of the fungus that was "[i]n the donor tissue."

## D.

### Testimony of Katrina Gundlach

Katrina Gundlach testified that she met Mr. Gundlach in 2014, and the parties married in 2015. She stated that she was the "bird lady," and Mr. Gundlach's only role with respect to the bird feeders was to order bird food from Amazon. Prior to May 2018, Mr. Gundlach's respiratory condition "was gradually declining," and he was using a portable oxygenator along with a large oxygenator in their home. Ms. Gundlach testified that her husband's condition had improved since he came home in May of 2018. Since the lung transplant, he was "profoundly better."

## E.

### Motion for Judgment

Appellants moved for judgment at the close of all the evidence, arguing that, as a matter of law, Mr. Gundlach did not sustain an occupational disease compensable under the Act. Counsel for appellants asserted that this was a legal issue unrelated to the sufficiency of the evidence, stating: "When the facts are undisputed, the legal significance of those facts is for a [c]ourt to determine." Counsel argued in this regard that the

14

presumption of correctness accorded to a decision of the Commission under the Act applies only to factual questions, and in this case, the presumption did not apply because it was a question of law whether Mr. Gundlach sustained an occupational disease compensable under the Act.

Counsel argued that occupational diseases "are very specifically limited and circumscribed. They are a creature completely of statute." Compensation for an occupational disease is subject to LE § 9-502(d), which is the "limitation on liability," and an occupational disease that causes disability is compensable only if it is due to the nature of the employment or if manifestations of the disease are consistent with exposure to an agent attributable to the type of employment. Counsel argued that, even if there was sufficient mold in the workplace to satisfy causation, Mr. Gundlach's pneumonitis was not an occupational disease because financial advisors are not prone to get this disease. There was nothing about Mr. Gundlach's type of employment, i.e., "that of a financial advisor," which was "linked, in any way, to biological, chemical or physical agents. If there was mold in this specific job, that has nothing to do with the type of employment."

Counsel for Mr. Gundlach argued that the court should deny appellants' motion for judgment, stating: "The only verdict a reasonable jury could support in this case is a finding that the [C]ommission was correct." Counsel argued that the Commission's decision constituted evidence that "the disease was due to the nature of the employment in which the hazard of the disease actually exists[,] or the symptoms of the disease are consistent with those known to result from exposure to a physical, biological or chemical agent attributed to the type of employment."

15

Counsel asserted that, according to Dr. Myerson's testimony, mold is a biological agent, and having office space was "part of the sit-down kind of job" that Mr. Gundlach performed for Morgan Stanley. Counsel argued that such "evidence, alone, will support a jury verdict in favor of Mr. Gundlach." Counsel also asserted that Mr. Gundlach "is an office worker. . . . And [if] an office space is not concomitant to all of the professional people who work, I don't know what is." In this regard, counsel argued:

> This mold is attributable to the office space where he was working as a financial planner on this job and it is true. There is not mold in every single office space but there is office space in every single employment as a financial advisor and so, therefore, a concomitant of that employment is office space.

The circuit court denied appellants' motion for judgment. It found that "the statute does cover this nature of employment and this type of employment that Mr. Gundlach was engaged in," and it was up to the jury to determine whether Mr. Gundlach's pneumonitis was an occupational disease.

## F.

### Closing Arguments

In closing argument, counsel for appellants stated that Mr. Gundlach's pneumonitis was "a serious medical condition," but the question for the jury was "whether his occupation, his position as a financial analyst . . . caused that occupational disease." Counsel noted that, when Mr. Gundlach was asked whether his job duties as a financial advisor caused him to have pneumonitis, Mr. Gundlach "admitted frankly no."

Counsel argued that "Dr. Myerson was very clear," and "[t]here is no evidence in the medical literature that being a financial advisor is likely to cause his condition."

16

Counsel stated: "There is no evidence from governmental documents that being a financial advisor is likely to cause this particular condition."

Counsel for Mr. Gundlach argued that the Commission's decision was presumed to be correct, and appellants had the burden of proving, by a preponderance of the evidence, that the decision was wrong, which they failed to do. Counsel argued that "the symptoms of the [pneumonitis] are consistent to those known to result from exposure to a biological agent attributable to the type of [employment]." As a financial advisor, Mr. Gundlach worked in an office, and "[a]n office is an inherent part of his job. It is not done anywhere else. It is [as] much a part of his job as a factory is to a line worker, as a cave is to a miner, as a radiology room is to an x-ray professional." Counsel also asserted that Mr. Gundlach's pneumonitis "was caused by a biological agent, mold, attributable to his employment as a financial manager[,] . . . [w]here he works is part of his job and anybody who says anything else [has] strained logic."

## G.

### Jury Verdict and Judgment

On October 7, 2022, the jury returned a verdict in favor of Mr. Gundlach, finding that he had sustained an occupational disease of pneumonitis due to his employment as a financial advisor for Morgan Stanley, with a date of disablement of May 3, 2018.[6] On

---

[6] During deliberations, the jury sent a note asking what is "type of employment" as related to the instruction on occupational disease. Counsel for Mr. Gundlach initially stated that "type of employment" was the same as "nature of employment," but the court ultimately responded that the jury should review the instructions given. We note that the instructions given conformed to the statute, but they did not define "type of employment."

October 13, 2022, the court issued an order affirming the Commission's decision and remanding the matter to the Commission for entry of a finding consistent with the jury's verdict.

This appeal followed.

## STANDARD OF REVIEW

Before addressing the merits of this case, we must address the applicable standard of review. In that regard, we note that we are reviewing an appeal from a commission ruling that was appealed to the circuit court in what was essentially a *de novo* trial. *See* LE § 9-745; *see also Gen. Motors Corp. v. Bark*, 79 Md. App. 68, 73 (1989) (a *de novo* "appeal to the circuit court from a decision of the Workers' Compensation Commission is totally different" from the typical appeal from an administrative agency decision).

Mr. Gundlach argues that the court properly denied the motion for judgment because the issue whether mold was attributable to Mr. Gundlach's type of employment, financial planning, was a factual issue, and appellants failed to meet their burden to overcome the presumption that the Commission's order was correct. This Court, however, has made clear that the language regarding the presumption of correctness of the Commission's decision "is only pertinent when the issue on appeal to the circuit court is one of fact and not of law." *Simmons v. Comfort Suites Hotel*, 185 Md. App. 203, 211 (2009) (quoting *Bd. of Educ. v. Spradlin*, 161 Md. App. 155, 173 (2005)). *Accord Symons v. R.D. Grier & Sons Co.*, 10 Md. App. 498, 500 (1970) (the presumption of correctness "has no application where the question is one of law instead of fact").

18

Here, the issue is one of statutory construction, *i.e.*, what the statute means in limiting compensation to diseases that result from exposure to an agent attributable to the "type of employment." That is an issue of law. *See Davis v. State*, 474 Md. 439, 451 (2021) ("matters of statutory construction" are issues of law).

As this Court has explained, in a workers' compensation case,

> [t]he question as to whether an injury arose out of or in the course of employment is ordinarily, like negligence or want of probable cause, a mixed question of law and fact, but when the facts have been ascertained and agreed upon by the parties, or are undisputed, and there is no dispute as to the inferences to be drawn from the facts, the question becomes one of law and may be decided by the court.

*Schwan Food Co. v. Frederick*, 241 Md. App. 628, 645 (2019) (quoting *Harrison v. Cent. Constr. Corp.*, 135 Md. 170, 180 (1919)) (alteration in original). *Accord Tavel v. Bechtel Corp.*, 242 Md. 299, 303 (1966) ("where the essential terms and manner of employment are undisputed, the question is one of law for the court"). We review the court's ruling on a motion for judgment *de novo*, "considering the evidence and reasonable inferences drawn from the evidence in the light most favorable to the non-moving party." *Amaya v. DGS Constr., LLC*, 479 Md. 515, 540 (2022) (quoting *Thomas v. Panco Mgmt. of Md., LLC*, 423 Md. 387, 393–94 (2011)).

## DISCUSSION

Appellants contend that the circuit court erred in denying their motion for judgment because, as a matter of law, Mr. Gundlach's pneumonitis did not constitute an occupational disease under LE § 9-502. They assert that, "even assuming *arguendo* that exposure to some form of mold in the particular Morgan Stanley Annapolis branch office led to the

19

manifestation of [Mr. Gundlach's] pulmonary disease," nothing in the record showed that the condition was due to the nature of his employment as a financial advisor or attributable to that type of employment. Appellants argue that "type of employment refers to the general employment of financial advisors as a whole," not "to one particular employment at one particular workplace." They contend that there were no facts adduced that "could reasonably lead to the inference that exposure to mold is attributable to the type of employment of financial advisors," and the facts failed to show, as a matter of law, that Mr. Gundlach suffered from a compensable occupational disease, under the limits on liability set forth in LE § 9-502(d).

As indicated, Mr. Gundlach contends that the court properly denied appellants' motion for judgment because the issue whether exposure to mold was attributable to his type of employment, i.e., a financial advisor who was required to be in an office building, was a factual question for the jury. As we have explained, however, we conclude that the issue presented here is a legal question.

"The Workers' Compensation Act provides compensation for, among other things, 'covered employees' who become 'partially or totally incapacitated' due to an 'occupational disease' acquired in the course of their employment." *Baltimore Cnty. v. Quinlan*, 466 Md. 1, 18 (2019); LE § 502(a). "Occupational disease is defined in § 9-101(g) as 'a disease contracted by a covered employee: (1) as the result of and in the course of employment; and (2) that causes the covered employee to become temporarily or permanently, partially or totally incapacitated.'" *King v. Bd. of Educ. of Prince George's Cnty.*, 354 Md. 369, 377 (1999).

20

Section 9-502(d), however, limits liability in this regard. It provides, in relevant part, as follows:

> (d) *Limitation on liability.* – An employer and insurer are liable to provide compensation under subsection (c) of this section only if:
>       (1) the occupational disease that causes the death or disability:
>             (i) is due to the nature of an employment in which hazards of the occupational disease exist and the covered employee was employed before the date of disablement; or
>             (ii) has manifestations that are consistent with those known to result from exposure to a biological, chemical, or physical agent that is attributable to the type of employment in which the covered employee was employed before the date of disablement; and
>             (2) on the weight of the evidence, it reasonably may be concluded that the occupational disease was incurred as a result of the employment of the covered employee.

LE § 9-502(d). *Accord King*, 354 Md. at 377.

The Supreme Court has defined an occupational disease as "one which arises from causes incident to the profession." *Quinlan*, 466 Md. at 20 (quoting *Victory Sparkler & Specialty Co. v. Francks*, 147 Md. 368, 379 (1925)). The statute, however, provides that compensable occupational diseases are only those that are due "to the nature of an employment in which hazards of the occupational disease exist" or those that are consistent with an agent "attributable to the type of employment." LE § 9-502(d)(1)(i)–(ii). For either variety, there must be proof to support a finding that the disease was incurred as a result of the employment.

The Maryland appellate courts have issued several opinions relating to LE § 9-502(d)(1)(i), where an employee suffered a disease that is "due to the nature of an employment in which hazards of the occupational disease exist." *See, e.g., Quinlan*, 466 Md. at 25–26 (degenerative meniscal tears qualified as an occupational disease as a matter

21

of law because the occupation of paramedic requires frequent kneeling and stress in the knee, and these hazards led to the development of degenerative knee conditions); *Black and Decker Corp. v. Humbert*, 189 Md. App. 171, 191 (2009) (shoulder impingement syndrome was a compensable occupational disease because repeated overhead arm motions are a hazard inherent in the occupation of an electrician); *Davis v. Dyncorp*, 336 Md. 226, 237 (1994) (mental disease alleged to be the result of harassment from fellow employees was not an occupational disease because harassment by fellow employees "is n[ot] a hazard within the nature of the employment of a computer data operator"); *Lettering Unlimited v. Guy*, 321 Md. 305, 308–12 (1990) (carpal tunnel syndrome is an occupational disease related to claimant's duties with respect to "machine embroidery on jackets and silk screening on tee shirts").

Mr. Gundlach, however, is not relying on LE § 9-502(d)(1)(i).  Rather, he asserts that he is entitled to recovery under LE § 9-502(d)(1)(ii), asserting that his pneumonitis is consistent with exposure to mold that is attributable to the type of employment in which he was engaged, i.e., a financial advisor that works in an office.  Neither party cites cases interpreting the meaning of "type of employment" in LE § 9-502(d)(1)(ii).

To interpret LE § 9-502(d)(1)(ii), we follow well-settled principles of statutory construction.  Our primary goal is "to ascertain and effectuate the General Assembly's purpose and intent when it enacted the statute." *Shivers v. State*, 256 Md. App. 639, 658 (2023) (quoting *Wheeling v. Selene Fin. LP*, 473 Md. 356, 376 (2021)).  We seek to "discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by the statutory provision under scrutiny." *Id.*  (quoting *Wheeling*, 473 Md. at 376).

22

*Accord Bartenfelder v. Bartenfelder*, 248 Md. App. 213, 235–36 (2020), *cert. denied*, 472 Md. 5 (2021).

In construing the provisions of the Workers' Compensation Act, we typically construe them "liberally, where possible, in order to effectuate the broad remedial purpose of the statutory scheme." *Quinlan*, 466 Md. at 16 (quoting *Uninsured Emps. Fund v. Danner*, 388 Md. 649, 659 (2005)). This general rule of construction, however, does not apply to all provisions of the Act. *See Buskirk v. C.J. Langenfelder & Son, Inc.*, 136 Md. App. 261, 270 (2001) (general rule of liberal construction of the Act is not applicable to the limitations provision to reopen awards). The principle to construe remedial legislation liberally in favor of an injured employee "does not grant us license to alter the statute beyond its clear meaning and the legislature's intent." *Marsheck v. Bd. of Trs. of Fire and Police Emps.' Ret. Sys. of City of Balt.*, 358 Md. 393, 403 (2000).

In determining the intent of the legislature:

> [W]e begin with the normal, plain meaning of the statute. If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to the legislative intent ends ordinarily and we apply the statute as written without resort to other rules of construction. We neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute, and we do not construe a statute with "forced or subtle interpretations" that limit or extend its application.

*State v. Bey*, 452 Md. 255, 265 (2017).

Looking first to the plain language of the statute, we note that the phrase "type of employment" is not defined in the statute. The Supreme Court of Maryland has interpreted the term "employment" in LE § 9-502(d)(i) to mean "the profession or general occupation in which the person is engaged," not "the specific job in which the person is working."

23

*King*, 354 Md. at 381–82. *Accord Quinlan*, 466 Md. at 20 n.4. With regard to the word "type," we turn to the dictionary definition. *See In re Abhishek I.*, 255 Md. App. 464, 473 (2022) ("In determining the plain meaning of statutory language, reference to dictionaries is appropriate."). *Merriam-Webster Dictionary* defines "type" as, among other things, "a particular kind, class, or group." *Type*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/type (last visited May 15, 2024). Based on those interpretations, we construe the phrase "type of employment" in LE § 9-502(d)(1)(ii) to mean the particular kind of profession or occupation in which the claimant was employed.[7] Thus, assuming that pneumonitis is consistent with exposure to mold, the disease is compensable only if exposure is attributable to Mr. Gundlach's profession as a financial advisor.

The plain language of LE § 9-502 provides that the requirements listed constitute limitations on liability. The statute provides that an employer and insurer are liable to provide compensation "only if" the limitations in LE § 9-502(d) are satisfied. That plain language is consistent with the legislative history indicating limited circumstances in which a disease will be found to be a compensable occupational disease.

"Until 1939, the General Assembly did not recognize occupational disease as a compensable claim." *Quinlan*, 466 Md. at 19 (cleaned up). *Accord Davis*, 336 Md. at 233 ("Traditionally, occupational diseases were not compensable under the Workers' Compensation Act."); *see also* J. Nicholas Shriver, Jr., *The Maryland Occupational*

---

[7] In *Davis v. Dyncorp*, 336 Md. 226, 236–37 (1994), in construing the phrase "nature of an employment," the Supreme Court noted that Black's Law Dictionary 1027 (6th ed 1990) defined "nature" to mean "[a] kind, sort, type, order; general character." The definitions of "nature" and "type," therefore, are similar.

24

*Disease Law*, 4 Md. L. Rev. 133, 135 (1940). In 1939, the legislature enumerated a schedule of occupational diseases that could be covered. *Quinlan*, 466 Md. at 19. At that point, "occupational disease meant only the diseases enumerated and specified in the schedule." *Davis*, 336 Md. at 234–35 (cleaned up).

We will briefly discuss, in relevant part, the changes in the statute through the years. Although the statute subsequently was expanded, and it is no longer limited to specific diseases, the Supreme Court has recognized "that the Act is designed to provide compensation to workers injured by the *effects of industry*," and "the definition of occupational disease should not be read too loosely." *Davis*, 336 Md. at 235 (quoting Richard P. Gilbert & Robert L. Humphreys, Jr., *Maryland Workers' Compensation Handbook*, § 8.2-2, at 168–69 (2d ed. 1993)).

In 1951, Article 101, § 22, the predecessor to LE § 9-502(d), provided:

(c) An employer shall not be liable for any compensation for an occupational disease unless such disease, except in the case of silicosis, asbestosis or other pulmonary dust disease, shall be due to the nature of an employment in which the hazards of such disease actually exists, are characteristic of and peculiar to the trade, occupation, process, or employment, and is actually incurred in his employment and unless disablement or death results within one (1) year after the last injurious exposure to such disease in such employment, or, in the case of death, unless death follows continuous disability from such disease, commencing within the period above limited, for which compensation has been paid or awarded or claim made as provided in this Article, and results within seven (7) years after such last exposure.[8]

---

[8] In 1951, there was a separate provision involving death or disability due to silicosis, asbestosis, or other pulmonary dust disease. Md. Code (Flack 1951), art. 101 § 22(d) (repealed by Acts 1991, ch. 8, § 1, effective October 1, 1991, and by Acts 1996, ch. 10, § 15, approved April 9, 1996). *Accord Johnston Coal & Coke Co. v. Dishong*, 198 Md. 467, 471–72 (1951).

Md. Code (Flack 1951), art. 101 § 22(c) (currently codified at LE § 9-502(d)).

In 1967, the phrase "type of employment" was inserted into the statute.  The statute was amended to read:

> (c) An employer shall not be liable for any compensation for an occupational disease unless such disease, except in case of silicosis, asbestosis or other pulmonary dust disease, shall be due to the nature of an employment in which the hazards of such disease actually exist, AND TO A REASONABLE DEGREE OF MEDICAL CERTAINTY IS ATTRIBUTABLE TO HIS TYPE OF EMPLOYMENT, **[,**are characteristic of and peculiar to the trade, occupation, process, or employment,**]** and is actually incurred in his employment and unless disablement or death results within one (1) year after the last injurious exposure to such disease in such employment, or, in the case of death, unless death follows continuous disability from such disease, commencing within the period above limited, for which compensation has been paid or awarded or claim made as provided in this article, and results within (7) years after such last exposure.

1967 Md. Laws 263.

In 1980, the statute was again amended.  The initial proposal was to change the language to the following:

> (C) FOR PURPOSES OF THIS SECTION, A DISEASE IS PRESUMED TO BE AN "OCCUPATIONAL DISEASE" IF THE MANIFESTATIONS OF THE DISEASE ARE CONSISTENT WITH THOSE KNOWN TO RESULT FROM EXPOSURE TO A GIVEN PHYSICAL, BIOLOGICAL, OR, CHEMICAL AGENT, AND IN WHICH THERE IS A REASONABLE LIKELIHOOD THAT THE INJURIOUS AGENT IS OR WAS PRESENT IN THE WORKING ENVIRONMENT.

Bill File, S.B. 396, at 231 (1980).  There was opposition to this proposal, specifically to the inclusion of a presumption of an occupational disease and the deletion of a requirement of a reasonable degree of certainty that the disease was attributable to employment.  *See, e.g.*, Letters From Montgomery Cnty. Gov't  Office of State Affairs (Feb. 14, 1980), Md. Mun. League, (Apr. 1, 1980), Prince George's Chamber of Commerce (Mar. 31, 1980),

26

Hagerstown / Washington Cnty. Chamber of Commerce (Mar. 31, 1980), Preston Trucking

Co., Inc. (Mar. 31, 1980) (Bill File, S.B. 396, at 285, 295, 294, 301 (1980)).[9]

The language ultimately adopted was as follows:

> (c) An employer shall not be liable for any COMPENSATION FOR AN OCCUPATIONAL DISEASE UNLESS:
>
> (1) SUCH DISEASE IS DUE TO THE NATURE OF AN EMPLOYMENT IN WHICH THE HAZARDS OF THE DISEASE ACTUALLY EXIST, AND IT MAY REASONABLY BE CONCLUDED, BASED ON THE WEIGHT OF THE EVIDENCE, THAT THE DISEASE WAS INCURRED AS A RESULT OF HIS EMPLOYMENT; OR
>
> (2) THE MANIFESTATIONS OF THE DISEASE ARE CONSISTENT WITH THOSE KNOWN TO RESULT FROM EXPOSURE TO A GIVEN PHYSICAL, BIOLOGICAL, OR CHEMICAL AGENT ATTTRIBUTABLE TO HIS TYPE OF EMPLOYMENT, AND IT MAY REASONABLY BE CONCLUDED, BASED ON THE WEIGHT OF THE EVIDENCE, THAT THE DISEASE WAS INCURRED AS A RESULT OF HIS EMPLOYMENT.

1980 Md. Laws 2430–31.

In 1991, the statute was amended slightly, with the terms set forth in the current

statute, as follows:

> (d) *Limitation on liability.* – An employer and insurer are liable to provide compensation under subsection (c) of this section only if:
> (1) the occupational disease that causes the death or disability:

---

[9] This Court has previously noted that "not all legislative history has equal value[.]" *Logan, Trustee Under Harold A. Logan Trust Agreement Dated April 30, 2007 v. Dietz*, 258 Md. App. 629, 669 n.10 (quoting Jack Schwartz & Amanda Stakem Conn, *The Court of Appeals at the Cocktail Party: The Use and Misuse of Legislative* History, 54 Md. L. Rev. 432, 437 (1995), *cert. denied*, 486 Md. 221 (2023). "[M]aterial[s] provided by people or organizations at committee hearings are generally advocacy statements that may have a more limited purpose." *Id.* We included a few of the letters provided to give context to the legislative history of the statute.

(i) is due to the nature of an employment in which hazards of the occupational disease exist and the covered employee was employed before the date of disablement; or

(ii) has manifestations that are consistent with those known to result from exposure to a biological, chemical, or physical agent that is attributable to the type of employment in which the covered employee was employed before the date of disablement; and

(2) on the weight of the evidence, it reasonably may be concluded that the occupational disease was incurred as a result of the employment of the covered employee.

LE § 9-502(d).

This legislative history confirms, as the Supreme Court of Maryland has explained, that there has always been a "legislative emphasis on the relationship between a particular disease and a particular type of employment." *Davis*, 336 Md. at 237. The phrase "type of employment" was substituted in 1967 for the language providing that the hazards of the disease were "characteristic of and peculiar to the trade, occupation, process, or employment." 1967 Md. Laws 263. This legislative history is consistent with our construction of the phrase "type of employment" to mean "the particular kind of profession or general occupation in which the employee was employed."

Here, the type of employment in which Mr. Gundlach was employed was financial planning, and the duties of this type of employment involve discussing and advising clients regarding their financial situation and potential investments. There was no evidence introduced that showed that pneumonitis resulting from exposure to mold is a recognized risk of being a financial advisor or is otherwise attributable to employment as a financial advisor. Indeed, Mr. Gundlach acknowledged during his deposition that there was not "anything about the job, itself, the duties of a financial advisor, a senior vice president, a

28

portfolio manager, that would cause [him] to have pneumonitis." Dr. Myerson also testified, based on his review of the medical literature, that being a financial advisor, the "type of employment" in which Mr. Gundlach was employed, did not involve exposures to pulmonary intoxicants, and there was no causal relationship between the occupation of a financial advisor and pneumonitis.

Mr. Gundlach contends, however, that the type of employment includes the place where the work is to be done, and because he was required to work in an office, the type of employment here was that of an office worker. We disagree. As indicated, we have construed "type of employment" to mean the particular kind of profession, which here, was financial planning. There was no evidence here that exposure to mold is attributable to employment as a financial advisor.

In reaching our conclusion that Mr. Gundlach's pulmonary fibrosis was not attributable to his type of employment, that of a financial advisor, we note that other jurisdictions support our holding that, for an occupational disease to be compensable, the disease must arise from "a distinctive feature of the type of work performed." *Dando v. Binghamton Bd. of Educ.*, 490 N.Y.S.2d 360, 361 (N.Y. App. Div. 1985). In *Dando*, the claimant, a high-school teacher, argued that "her disability was caused by exposure to the hydrocarbons in the environment of [a] new addition of the school building while it was under construction." *Id.* at 361. Affirming the Workers' Compensation Board's conclusion that the "claimant had not incurred an occupational disease," the Court stated: "Here, claimant's ailment, to the extent it can be said to have arisen out of and in the course of her employment, *was not one of the generally recognized risks of the teaching*

29

*profession*, but was, instead a hazard of being in one particular building." *Id.* at 361–62 (emphasis added).

In another case, involving interstitial pulmonary fibrosis, the New York Supreme Court, Appellate Division reversed a Workers' Compensation Board decision finding an occupational disease because the claimant "ha[d] not demonstrated that his lung condition [was] attributable to a distinctive feature of his job as a delivery truck driver." *Engler v. United Parcel Serv.*, 767 N.Y.S.2d 496, 498 (N.Y. App. Div. 2003). Instead, the Court held that the claimant's condition resulted from "the specific environment in which he worked." *Id.* The Court stated: "In order to obtain workers' compensation benefits based upon an occupational disease, the claimant must 'establish a "recognizable link" between his condition and a distinctive feature of his occupation.'" *Id.* (quoting *Bates v. Marine Midland Bank*, 682 N.Y.S.2d 282, 283 (N.Y. App. Div. 1998)).[10]

We agree with the reasoning of these cases and hold that, to be compensable as an occupational disease under LE § 9-502(d)(1)(ii), the employee must show exposure to a biological, chemical, or physical agent that is a distinctive feature of the type of work performed, as opposed to a specific condition at the employee's particular workplace.

---

[10] In New York, courts have held that "exposure to tainted air in the workplace may constitute a compensable accidental injury." *Martin v. Fulton City School Dist.*, 754 N.Y.S.2d 676, 677 (N.Y. App. Div. 2002). *Accord Connolly v. Covanta Energy Corp.*, 100 N.Y.S.3d 447, 451 (N.Y. App. Div. 2019) (substantial evidence supported Commission's finding that claimant's accidental injury resulted from exposure to mold). As indicated, appellants assert that, if the pneumonitis was found to have been caused by a condition in the workplace, a claim for accidental injury was the vehicle for seeking compensation, not occupational disease. Whether Mr. Gundlach's pneumonitis was compensable as an accidental injury is not an issue before us.

Exposure must be a recognized risk of the type of employment, "[i]t is not enough that the ailment is caused by the specific place in which the claimant happens to work." *Dando*, 490 N.Y.S.2d at 361.

Here, there was no evidence that mold exposure is a known risk or distinctive feature of the job of a financial advisor. There was no evidence that Mr. Gundlach's pneumonitis, even if it resulted from mold exposure, was attributable to his employment as a financial advisor. Therefore, he was not entitled, as a matter of law, to workers' compensation for an occupational disease. *See Davis*, 336 Md. 237 (rejecting a claim for occupational disease because employment as a computer operator did not make claimant "more susceptible to harassment than any other kind of employment"). The circuit court erred in denying appellants' motion for judgment.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO ENTER JUDGMENT IN FAVOR OF APPELLANTS. COSTS TO BE PAID BY APPELLEE.**

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/1554s22cn.pdf